**In re LEWIS INDUSTRIES, a Montana corporation, d/b/a Lewis Construction Company, Western Sign Corp., Highway Specialties, Inc., Northern Construction Company, Rocky Mountain Ready Mix, Western Contractors, Inc., Concrete Service Company, Nationwide Electric Corp., Debtor.**

**Bankruptcy No. 485–00577.**

United States Bankruptcy Court, D. Montana.

July 10, 1987.

Patrick F. Flaherty, Great Falls, Mont., for debtor.

Ward E. Taleff, Great Falls, Mont., for bank.

ORDER DENYING CONFIRMATION

JOHN L. PETERSON, Bankruptcy Judge.

In this Chapter 11 proceeding, hearing was held on the Debtor's Third Amended Plan of Reorganization (as modified on

debtors' savings, 11 U.S.C. § 101(4), or whether there is a mutual "debt", 11 U.S.C. § 101(11).

April 8, 1987), together with objections (Eastside). Ballots filed in this cause by thereto by Eastside Bank of Montana creditors are as follows:

| Class | Creditor | Amount | Vote |
|-------|----------|--------|------|
| I | Montana Teamsters Employers Trust | $ 2,731.74 | Accepts |
| | Western Conference of Teamsters Pension Trust Fund . | 2,971.33 | Accepts |
| | Cement Masons Employers Trust | 3,466.57 | Accepts |
| | Montana Laborers A.G.C. Trust Funds | 4,278.04 | Accepts |
| | Montana A.G.C. Teamsters Trust | 325.28 | Accepts |
| | Montana Operating Engineers Trust Funds | 14,379.66 | Accepts |
| | Arizona Laborers, Teamsters and Cement Masons | 9,959.38 | Rejects |
| II | Montana Dept. of Revenue | 64,546.39 | Accepts |
| | Employment Security Commission of Wyoming | 7,685.90 | Rejects |
| | Internal Revenue Service | 245,598.62 | Accepts |
| III | Cascade County | 30,178.08 | Accepts |
| IV | First Bank West | 21,031.33 | Accepts |
| V | Eastside Bank of Montana | 707,796.40 | Rejects |

| Class | Creditor | Amount | Vote |
|-------|----------|--------|------|
| VI | Montana Laborers A.G.C. Trust Funds | $ 9,493.77 | Accepts |
| | Montana A.G.C. Teamsters Trust | 528.07 | Accepts |
| | Montana Operating Engineers Trust Funds | 20,052.37 | Accepts |
| | United Materials | 378.95 | Rejects |
| | Eagle Foundry Co. | 10,981.58 | Accepts |
| | John E. Myers, P.C. | 750.00 | Accepts |
| | Richem Construction | 90.00 | Accepts |
| | Bennett Pontiac GMC Motors | 273.52 | Accepts |
| | Newman Signs, Inc. | 19,000.00 | Accepts |
| | Preferred Advertising Co. | 251.39 | Accepts |
| | Western Equipment Co. | 289.00 | Accepts |
| | A & I Distributors | 328.59 | Accepts |
| | Rimrock Tire, Inc. | 419.16 | Accepts |
| | Big Sky Fuel Supply | 4,126.24 | Accepts |
| | Tire-Rama | 379.25 | Accepts |
| | Canica Export Corp. | 1,165.20 | Accepts |
| | Radiator Specialty Company | 2,131.00 | Accepts |
| | Universal Plastics Co. | 311.09 | Accepts |
| | Liffring Machine & Repair | not stated | Accepts |
| | Loucks & Glassley, CPA | 25,849.60 | Accepts |
| | ANR Freight System, Inc. | 567.49 | Accepts |
| | Gerbers of Montana | 172.17 | Accepts |
| | Cogswell Agency | 37,475.97 | Accepts |
| | Cook-McCann Concrete, Inc. | 75,395.28 | Accepts |
| | West Coast Wire Rope & Rigging of Portland, Inc. | 6,220.80 | Accepts |
| | Wausau Insurance Companies | 21,500.00 | Accepts |
| | Wyoming Machinery Company | 276.06 | Rejects |
| | Bowman & Kemp Steel & Supply Co. | 665.00 | Accepts |
| | V. C. Johnston Lbr. Co. | 131.73 | Accepts |
| | Savage Bros. | 13,770.00 | Accepts |
| | Westate Machinery Co. | 1,091.92 | Accepts |
| | Tri-State Equipment, Inc. | 7,520.38 | Accepts |
| | Allied Carriers Exchange, Inc. | 793.43 | Rejects |
| | Empire Steel Manufacturing Co. | 1,090.00 | Accepts |
| | Dorsey & Whitney | 553.75 | Accepts |
| | H & H Implement | 215.17 | Accepts |
| | C & L Pension Fund | 160,000.00 | Accepts |
| | American Highway Sign Corp. | 500.00 | Accepts |
| | Kaiser Cement Corporation | 206,141.06 | Accepts |
| | Swanberg, Koby, Swanberg & Matteucci | 7,740.23 | Accepts |

All classes of creditors are impaired under the Plan in that their legal rights are modified by the Plan. *In re Acequia,* 787 F.2d 1352 (9th Cir.1986); *In re Martin,* 66 B.R. 921 (Bankr.Mont.1986). Classes I, II, III, IV and VI have all voted affirmatively in favor of the Plan, thus satisfying Section 1129(a)(10) of the Bankruptcy Code. Objections of Eastside include four separate grounds, to-wit: (1) the Plan is not feasible; (2) the Plan has not been proposed in good faith; (3) the Plan does not comply with the provisions of 1129(b) (cramdown); and (4) the unsecured creditors would receive more on liquidation than under the Plan and thus 1129(a)(7), the best-interest-of-creditors test, is not satisfied.

Lewis Industries was started in 1935 by the purchase of Cascade Electric Company by the founder Leo Lewis. In 1942, Lewis Construction Company was added, Concrete Service Company in 1961, Western Sign Corporation in 1965 and Rocky Mountain ready Mix in 1977. In 1979 Lewis Industries was formed and became the owner of all the stock of each of the other companies. In the period of 1980 to 1983 various other operating entities were added to Lewis Industries ownership.

The various companies of Lewis Industries were engaged in electrical contracting, power line construction and maintenance, specialty highway construction, sign manufacturing, production of ready mix concrete and crushed stone.

Historically, the various companies of Lewis Industries were generally profitable until 1982 when they began suffering losses due to a large debt burden, a general downturn in the construction industry, decreased contract volume in the highway construction due to government imposed absolute percentage requirements for minority owned businesses on each highway contract and severe losses from expansion of the highway and signing operations into Wyoming and Arizona. Lewis had suffered losses of $362,000.00 (3–31–82); $937,000.00 (3–31–83); income of $43,000.00 (3–31–84); a change of year to 12–31–84 with losses, due to discontinued operation, of $154,000.00 and losses at 12–31–85 of $238,000.00 due to substantial decrease in volume and lowered profit margin that year.

In July, 1982, Lewis entered into a long term bank financing agreement with Eastside. The agreement called for a $1,900,-000.00 line of credit and the consolidation of all the various companies' debt with Eastside and the pledging of virtually all the assets of all the companies to secure the debt. In early 1983, Lewis could not maintain payments on the debt. The loan agreement was modified and an auction sale was held in the spring of 1983 from which proceeds were applied to the debt. In July, 1983, Eastside informed Lewis they would not renew the operating note of $800,000.00 except for 30 days. Negotiations with the bank on repayment failed in September of 1983, and Eastside offset Lewis' bank account for an amount of $151,000.00. Later in October, an agreement was reached calling for rapid repayment of the remaining balance on the operating note. In January of 1984, it became impossible for Lewis to meet the payment schedule. An agreement was reached where Lewis would sell Cascade Electric Company to the former manager and apply the proceeds to the Eastside notes. This sale was consummated in January, 1985, which resulted in a new agreement. In April, 1985, Lewis suspended interest payments because of a need to use all available cash to finance the startup of spring construction work. Eastside filed a foreclosure action in October of 1985, and sought turnover of its collateral or the appointment of a receiver. Lewis then filed for Chapter 11 protection on November 5, 1985.

Lewis has been involved in attempted restructure of its businesses since January of 1983. During this period, Lewis has closed down, sold or changed unprofitable lines or areas of business, terminated its Arizona operations (losses of $650,000.00), the Wyoming company and shop, sold Cascade Electric, Rocky Mountain Ready Mix and parcels of real estate not essential to the business. Since bankruptcy, Lewis has consolidated its fragmented management operation and offices into one location, with

a corresponding reduction in overhead costs from in excess of $120,000.00 per month, to the current cost of approximately $29,000.00 per month.

In addition, two recent factors have added to the probability of continued profitable operations. Management has secured the resumption of powerline construction and maintenance operations with the Montana Power Company after a three year moratorium where, due to a lack of funds, Montana Power curtailed use of outside contractors to perform such work. This has resulted in the use of idle equipment in Lewis' possession and since the resumption in June of 1986, has provided gross revenue of $124,000.00 in three months. Secondly, management has taken steps to secure use of a hot asphalt plant and related paving operations within the Great Falls area. The asphalt mixing and paving operations integrate with the operation of the ready mix concrete operations of Concrete Service Company and will serve to provide much greater utilization of aggregate from the Lewis gravel pit both through the aggregate used in the asphalt paving mix and from providing gravel bases and fills used with paving contracts. Gross revenues of Lewis have increased from 2.6 million in 1984 to 3.6 million in 1986.

The assets of Lewis as evidenced by appraisals produced at the hearing on confirmation show as follows:

| Real Property: | Portion of Blocks 29, 30, 33 and 34, Original and Great Falls Water Power Township with improvements | $381,500.00 |
| | Gravel at Sun River Pit and residual value | 427,903.00[1] |
| | Equipment with Batch Plant | 839,000.00 |
| | Tools, Shop Machinery and Office Equipment | 179,581.00 |
| | Vehicles | 74,713.00 |
| | Inventories of gravel, parts and supplies | 310,592.00 |
| | Accounts receivable (3/31/87) | 236,903.00 |
| | Cash on hand (3/31/87) | 166,000.00 |

I find the total fair market value of assets is $2,616,192.00.

Class III creditor Cascade County has a secured claim for $30,178.08 against the above real and personal property. Class IV creditor First Bank West has a secured claim against the Debtor in the amount of $21,021.33. Class V creditor Eastside is oversecured with valid liens against the Debtor's real property, equipment, tools and vehicles, which total in value $1,725,-134.00. Eastside's claim is somewhat in dispute, but for the purpose of this order can be fixed at $898,627.00. Under the Plan, Eastside will be paid accrued interest at 9% per annum of $60,934.00 on January 15, 1988, and then annual installments of principal and interest of $124,709.00 over 12 years at 9% interest. Eastside will retain its lien against the Debtor's assets, except that for the purpose of replacing worn or obsolete equipment, upon sale of such equipment, the lien will attach to the proceeds of sale, and in the event Debtor replaces such equipment, Eastside's lien will be subordinated to a lender's lien which finances the new equipment, if such lien is perfected within the 20 day statutory period provided by law.

Eastside contends that the restructure of its total debt under the Plan is improper inasmuch as such indebtedness is made up of three separate obligations or notes, with different terms, amounts and security. Specifically, Eastside contends the Debtor is obligated on an operating loan with maturity of one year, an equipment loan of five years and a real property loan of ten years. As a result, Eastside's evidence shows the following obligations are due the Bank as of March 19, 1987, to-wit:

| A. | Real Estate note | – | Principal | – | $346,049.35 |
| | | | Interest | – | 79,972.95 |
| | | | | | 426,022.30 |
| B. | Equipment note | – | Principal | – | 202,115.43 |
| | | | Interest | – | 46,709.42 |
| | | | | | 248,824.85 |
| C. | Operating note | – | Principal | – | 159,631.62 |
| | | | Interest | – | 35,929.12 |
| | | | | | 195,560.74 |

Costs assessed by Eastside (without assessment to each individual obligation) are $21,-

1. The retail market value of the gravel in place is estimated at 1.6 million over an 11 year life of the pits.

182.81 for attorneys fees and $1,415.52 for appraisals, all which total $893,005.62. Eastside then argues to repay such debt the Plan should provide for variable interest rates of 10.75% to 13% so that Lewis should pay $208,650.00 by October 31, 1987 on the operating note, $67,764.00 for five years on the equipment note and $77,656.00 annually for 10 years on the real estate note. If the Bank's contentions were adopted (Eastside did not file a Plan in this case), Lewis would pay Eastside $354,-070.00 in the first year of the Plan, $145,-420.00 in the next four years and $77,-556.00 in years six through ten.

Lewis contends that from the original obligation of 1.9 million made in 1982, it has repaid principal down to $707,000.00, which it proposes to retire in 12 years together with interest totaling $857,442.00. The president of Lewis testified that in 1982 all loans were consolidated and restructured into a one payment plan. The written evidence shows that on January 7, 1985, Eastside and Lewis executed a Debt Restructuring Agreement, describing the past history of credit relations between the parties, and which stated that all obligations would be restructured so that $150,000.00 from the sale of Cascade Electric would be applied to all three loans, that the operating and equipment loan together with interest on the real estate loan would be paid by September 16, 1985, and the balance of the debt "amortized at a rate of interest specified in the relevant loan over a period of 36 months", first payment due September 17, 1985. The agreement obviously leaves the credit of payments to Eastside's sole discretion, except for sales realized from sales of real estate, which must be applied first to the real property loan. The agreement was executed with a condition that Lewis represented it had no intention of seeking Chapter 11 relief, and in return releasing Eastside from all causes of actions pre-dating January 7, 1985, all of which is later discussed in this opinion regarding the good faith filing of this proceeding by Lewis.

Eastside obviously knows and the evidence reflects that the debt repayment it proposes is unrealistic, and would destroy the feasibility of the Debtor's Plan. Clinging to such argument is legally indefensible under the Bankruptcy Code, for as stated in *In re Martin*, supra, at 927:

> "As to secured creditors, the plan may be confirmed under 1129(b)(2)(A)(i) if the secured creditor retains a lien securing the amount of its secured claim and it receives deferred cash payment having a present value, as of the effective date of the plan, equal to the present value of the collateral."

Moreover, as stated in *In re Acequia*, supra, at 1360:

> "11 U.S.C. § 1129(a)(1) (1987) provides that a court may only confirm a plan where '[t]he plan complies with the applicable provisions of this title'. See *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr.S.D.N.Y.1984)."

Thus if a plan satisfies the confirmation mandates of Chapter 11, it is confirmable, despite creditors dissent.

The real crux of Eastside's argument on its allowed claim as treated under the Plan goes to the term of repayment of 12 years at 9% interest. Eastside says 9% interest is not a prevailing market rate, and 12 years is too long for an operating or equipment loan. *In re Martin* holds, supra, at 930:

> " * * * the plan must, to be confirmed over the dissent of the secured creditors, propose that the secured creditors retain a lien on the collateral securing the amount of their allowed secured claims, and that they receive deferred cash payments having a present value equal to the value of the collateral securing their claims as of the effective date of the plan. 11 U.S.C. Section 1129(b)(2)(A)(i). If the plan also proposes to the secured creditors a reasonable rate of interest on their allowed secured claims, the present value and face value will be identical. See H.R.Rep. No. 595, at 414–15, 1978 U.S.Code Cong. & Ad.News at 6370–71.

*         *         *         *         *         *

The cases of *In re Welco Industries, Inc.*, 60 B.R. 880 (BAP 9th Cir.1986) and *United States v. Neal Pharmacal Co.*,

789 F.2d 1283 (8th Cir.1986), have settled the issue as to the appropriate rate of interest by holding the appropriate discount or interest rate is to be fixed by considering the 'prevailing market rate for a loan of a term equal to the payment period, with due consideration of the quality of the security and risk of subsequent default.' "

See also *In re Wolf,* 61 B.R. 1010 (Bankr.N. D.Iowa 1986); *In re Neff,* 60 B.R. 448 (Bankr.N.D.Tex.1985). *In re Citrowske,* 72 B.R. 613, 617 (Bankr.Minn.1987), a Chapter 12 case, holds:

"The proper interest or discount rate is a troublesome problem. However, the Eighth Circuit has addressed this issue and held:

The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration for the quality of the security and the risk of subsequent default.

*Prudential Insurance Co. v. Monnier (In re Monnier Bros.)* 755 F.2d 1336, 1339 (8th Cir.1985) quoting *5 Collier on Bankruptcy* ¶ 1129, at 1129–65 (15th ed. 1979). See also *United States v. Neal Pharmacal Co.,* 789 F.2d 1283 (8th Cir. 1986). Absent any evidence of collusive or discriminatory policies, the interest rate which the creditor involved would charge to the debtor in the present regular loan market is presumptively the correct interest rate, keeping in mind, however, that the ultimate decision about the quality of the security and the risk of subsequent default is for the court and not the creditor."

*United States v. Neal Pharmacal,* supra, at 1286 held:

"The bankruptcy court's sole reliance on the government's cost of borrowing without consideration of the risk of nonpay-

ment, the length of the payment period, and the existence of collateral is clearly contrary to the prevailing market rate approach referred to in *Monnier Bros.,* and adopted by other courts that have considered the issue under section 1129(a)(9)(c). We also reject the bankruptcy court's finding that a floating rate of interest would better accommodate fluctuations in interest rates in general, and would thus better provide the government with the present value of its claim. That section 1129(a)(9)(c) contemplates the use of a fixed interest rate is evident in its requirement that present value be determined 'as of the effective date of the plan.[2] Moreover, the use of a floating interest rate would be administratively difficult and would complicate a determination of the feasibility of the debtor's reorganization plan, a prerequisite for confirmation.' "

In *Neal,* the Circuit Court then held the Bankruptcy Court should adopt the rate fixed by the creditor (in that case the United States) subject nevertheless, to change in the rate if "it lags behind market rates in general and whether * * * the rate reflects the risk, quality of any security, and term applicable in the particular case." *Id.* at 1289. *Welco Industries,* supra, also rejected the cost of money approach and also is contrary to *Neal* in holding:

"The IRS argued that the rate under § 6621 was intended to be a variable rate, adjusted every six months, and also is alike binding upon the government when it owes refunds to taxpayers. The rate may be convenient to use but it is not the manner of assessing value in § 1129(a)(9)(c), as of the effective date of the plan, as contemplated by Congress. If Congress wishes to establish the use of 26 U.S.C. § 6621 in 11 U.S.C. 1129(a)(9)(c) it can say so." *Id.* at 883.

The *Welco* Appellate Court reversed the Bankruptcy Court's employment of § 6621 as the prevailing market rate by stating:

---

**2.** Both Section 1129(a)(7)(A)(ii) and 1129(b)(2)(i)(II) contain the same language that value is to be fixed "as of the effective date of the plan", and therefore the rationale of *Neal*

*Pharmacal Co.* that a fixed, not variable, rate is mandated by the Code is applicable to fixing the present value of secured and unsecured claims.

"We remand for determination of an appropriate interest rate which should be more in line with the prevailing market rate charged by *commercial* lenders taking into account the risk of default." *Id.* at 883 (Emphasis supplied).

Finally, on the issue of proper interest rate, one must examine the holding and language of *In re Glenn*, 796 F.2d 1144 (9th Cir.1986). *Glenn* involved a secured creditor's rights under Section 506(b), which allows a secured creditor whose claim is less than the value of the property to receive post-petition interest at the contract rate. In *Glenn*, the secured creditor held an allowed secured claim in the amount of $33,950.50, based on a note providing for 18% interest per annum, and secured by property worth $92,000.00. The Ninth Circuit Court of Appeals held:

"The Glenn's argument entirely ignores Section 506(b), which allows post-petition interest at the contract rate. The necessary consequence of Section 506(b) is an award in excess of the principal amount of the allowed secured claim."

Section 506(b) does not mandate a contract rate of interest as the prevailing market rate under 1129(a) or (b) as discussed in *Neal* and *Welco*. Rather, Section 506(b) is to be used to fix the amount of the secured creditor's claim, including post-petition interest at the contract rate, fees and costs, but upon confirmation, as of the effective date of the plan, the court must then decide how the restructured debt will be repaid under the plan so the creditor receives present value on its claim. Accordingly, the contract rate does not necessarily bind the court on confirmation, although in some cases, the contract rate may indeed be the prevailing market rate. In this regard, the Plan provides Eastside allowed secured claim of $898,627.00 as of April 15, 1987, shall accrue interest from April 15, 1987 to January 15, 1988, at 9% interest per annum. Such provision contravenes Section 506(b) on fixing of the Eastside claim, since Eastside as a fully secured creditor, is entitled to its contract rate of interest to the date of confirmation, and a prevailing market rate of interest thereafter.

I hold the 9% interest rate proposed in the Plan is not the prevailing market rate on the Eastside loan in view of the term proposed for repayment and the risk of loss of collateral during the 12 year Plan period. Three commercial lenders testified that a consolidation of the three types of loans—operating, equipment and real estate—demand variable rates of interest from 10¾ to 11% per annum, as long as the term of each loan is one year (operating), five years (equipment) and ten years (real estate). The Debtor's expert, stated that amalgamating all loans into one was a common practice among lenders, and a reasonable term would be 15 to 16 years at 8½ to 9%. It is a significant fact, however, that part of the security for the Eastside claim is the Debtor's gravel pits, which are valued at $405,000.00. The Debtor's expert testified, however, that the pit has a useful life of 11 years, (based on 1986 production) at which time the residual value of the land will be only $22,903.00. At that date, the Plan has still one more year to run, so that a significant portion of Eastside's security will have been dissipated. Moreover, on the equipment, vehicles and other items of personal property, the credible evidence is that commercial lenders do not extend terms on such items over 5 to 7 years. Even the Debtor recognizes in its Plan, as noted above, that the equipment will become obsolete or deteriorated, so as to require replacement during the 12 year Plan period. In short, the dissipation of the security in the gravel pit coupled with a life expectancy on equipment of 5 to 7 years, may very likely place Eastside at the end of 7 years in a high risk position, if it had to realize on its collateral upon default at that time. Further, there is even assurance, based on the optimism of the Debtor, that the gravel pits may indeed be dissipated before the 11 year period, thus further exacerbating the security position of Eastside. Under all testimony in this record, interest rates directly relate to risk. I therefore reject the testimony of Debtor's witness on interest rates as not credible under the facts of this case, as just enumerated. As stated in *In re Monnier*, supra, 755 F.2d at 1338–1339:

"One of the Code's few clues about what factors to take into account in selecting an appropriate interest rate appears in § 1129(b)(2)(A)(iii); that section states that a plan may be confirmed over the objections of a secured creditor if the plan affords the creditor the 'indubitable equivalent' of his claim. 11 U.S.C. § 1129(b)(2)(A)(iii). Legislative history indicates Congress intended for this phrase to take on the meaning given it by Judge Learned Hand in *In re Murel Holding Co.*, 75 F.2d 941, 942 (2nd Cir. 1935). See *In re American Mariner Industries*, 734 F.2d 426, 433 (9th Cir. 1984). As the Ninth Circuit has noted, *Murel* emphasized two factors in determining whether a reorganization plan provided a secured creditor adequate protection for the full value of his claim:

> Judge Hand concluded that the creditor's right to 'get his money or at least the property' may be denied under a plan for reorganization only if the debtor provides a 'substitute of the most indubitable equivalence'. Such a substitute clearly must both compensate for present value and insure the safety of the principal.

*In re American Mariner Industries*, 734 F.2d at 433 (emphasis added). Although § 1129(b)(2)(A)(iii), with its 'indubitable equivalent' standard, is stated as an alternative to deferred repayment of the secured debt under § 1129(b)(2)(A)(i)(II), we are satisfied from a reading of *Murel* that the congressional reference to the case expresses threshold requirements applicable to selection of an appropriate interest rate. Cf. *In re American Mariner Industries*, 734 F.2d at 432 ('indubitable equivalent' provision of 11 U.S.C. § 361 is a 'catch-all alternative')."

In this case the 12 year Plan at 9% interest does not provide Eastside with the indubitable equivalence of its bargain, both as to present value and insuring the safety of the principal.

Further, I adopt the rationale of *Neal* on the issue of variable rate. The Bankruptcy Code clearly mandates a fixed rate, based on prevailing market, and thus the conten-

tions of Eastside that the restructured claim should be based on a variable rate is rejected. Also rejected is Eastside's contention that it has three separate notes or obligations. Eastside, at the date of the bankruptcy petition, had one claim, fixed in amount, with collateral securing the claim. Indeed, each note is cross-collateralized by all of the Debtor's assets. Under Chapter 11, a Plan may provide for substitution of collateral, for the criteria under 1129(b) is that the holders of secured claims retain liens securing such claims to the extent of the allowed amount of such claims. 1129-(b)(2)(A)(i)(I).

Concluding, then on the issue dealing with Eastside's claims, and considering all of the attendant circumstances, I find that the prevailing interest rate for the type of loan, security and risk of the Eastside claim is 10¼%, or 2% over prime of 8¼%, for a term not to exceed 7 years, unless the claim is divided with a separate claim on the real estate, where the term of that claim can be up to 10 years. Since it is not the duty of the Court to write the Debtor's Plan, *Janssen Charolais Ranch, Inc.*, 73 B.R. 125, 4 Mont.B.R. 290, 296–297 (Bankr.1987), it will be incumbent upon the Debtor to restructure the claim of Eastside in accordance with this finding. In that regard, an amortization rate based on 12 years with a 7 year balloon at 10¼% would probably pass muster, assuming the evidence would show the Debtor had the ability in 7 years to make the balloon payment.

I note that on the issue of feasibility, the cash flow projection of the Debtor appears reasonable, especially when considering that the profit before accruing interest and depreciation for 1986 was $270,000.00. Certainly that type of cash flow can support a Plan, especially when the class of unsecured creditors overwhelmingly have voted in favor of the present Plan. I defer, however, any decision on feasibility until the Debtor files a modification to the Plan to deal with Eastside's claims.

On the issue that the Plan does not meet the best-interest-of-creditors test under 1129(a)(7), the record in this case fails to show the present value of the unsecured

claims if paid today, rather than beginning in 1991. The Debtor's liquidation analysis attached to the Plan shows a liquidated value of $1,718,809.00 (exclusive of cash), and a return to unsecured creditors of 18%. Under the Plan, the unsecured creditors will be paid 100% over the Plan term, which would appear to satisfy 1129(a)(7). Decision on this issue will likewise be deferred pending modification of the Plan. It is noted the Plan is indefinite as to the payment schedule for unsecured creditors, and in this regard, the Plan is therefore deficient.

One issue which should be decided is the good faith issue raised by Eastside. *In re Madison Hotel Associates*, 749 F.2d 410, 425 (7th Cir.1984), states:

"Though the term 'good faith' as used in Section 1129(a)(3) is not defined in the Bankruptcy Code, *see* 5 L. King, *Collier on Bankruptcy*, ¶ 1129.03[3] at 1129–14 (15th ed. 1979), the term is generally interpreted to mean there exists 'a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.' *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr.S.D.Cal.1982). See also *In re Coastal Cable T.V. Inc.*, 709 F.2d 762, 764 (1st Cir.1983); *Matter of Nikron, Inc.*, 27 B.R. 773, 778 (Bankr.E.D.Mich. 1983). Similarly, in the context of a Chapter 13 reorganization, this court has interpreted the identical 'good faith' language contained in 11 U.S.C. § 1325(a)(3) to require the bankruptcy court to review the proposed plan for accuracy and 'a fundamental fairness in dealing with one's creditors.' *In re Rimgale*, 669 F.2d 426, 432–33 (7th Cir.1982) (quoting *In re Beaver*, 2 B.R. 337, 340 (Bankr.S.D. Cal.1980). Thus, for purposes of determining good faith under section 1129(a)(3), as well as section 1325(a)(3), the important point of inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code. The district court's decision failed to make this legal distinction between the good faith that is required to confirm a plan under section 1129(a)(3) and the

good faith that has been established as a prerequisite to filing a Chapter 11 petition for reorganization. See, e.g., E. Di-Danato, *Good Faith Reorganization Petitions: The Back Door Lets the Stranger In*, 16 Conn.L.Rev. 1, 3 (1983)."

According to the good faith requirement of section 1129(a)(3), the court looks to the debtor's plan and determines, in light of the particular facts and circumstances, whether the plan will fairly achieve a result consistent with the Bankruptcy Code. The plan 'must be "viewed in light of the totality of the circumstances surrounding confection" of the plan [and] ... [t]he bankruptcy judge is in the best position to assess the good faith of the parties' proposals.' *In re Jasik*, 727 F.2d 1379, 1383 (5th Cir.1984) (quoting *Public Finance Corp. v. Freeman*, 712 F.2d 219, 221 (5th Cir.1983.))"

In accord: *In re Jorgensen*, 66 B.R. 104 (BAP 9th Cir.1986). The court has an independent duty to determine whether each element of Section 1129(a) is satisfied, and that includes a determination of whether confirmation of the plan will fairly achieve a result consistent with the Code. *In re Martin*, supra; *Big Shanty Land Corp. v. Comer Properties*, 61 B.R. 272 (Bankr.N. D.Ga.1985).

In this case, a portion of the Plan describes litigation which the Debtor has commenced against Eastside "for breach of contract, breach of fiduciary responsibility, fraud, both actual and constructive, and bad faith". The provision stated damages in excess of 2 million dollars are claimed and "[T]he attorneys engaged to prosecute the suit have advised the Debtor that prospects of substantial recovery appears quite favorable". Yet, to the detriment of the unsecured creditors totaling $959,822.00, who will not be paid under the Plan until beginning in January, 1991, the Debtor nevertheless proposes to pay Eastside its entire claim. The problem I see with the Plan as far as good faith is concerned has to do with the litigation against Eastside, which, of necessity, will require expenditure of funds from the estate to sustain costs of that suit. Chapter 11 of the Code

was established as a statutory procedure to rehabilitate a financially distressed Debtor, and allow such debtor to negotiate or propose extension or composition of its debts so as to continue in business. Once a Chapter 11 petition is filed, all assets of the estate come under the supervision of the Bankruptcy Court, to be dealt with in the plan of reorganization. Fairness to creditors, as noted above, is a key element in reorganization. Eastside, under the Plan has been deterred by Debtor's seeking relief under Chapter 11 from asserting its state rights of collection and foreclosure, under circumstances which the Debtor in the Debt Restructuring Agreement of January 7, 1985, released Eastside from all claims for damages for actions prior to January 7, 1985. In seeking relief under Chapter 11, the Debtor has elected its remedy against Eastside, namely, debt restructure. It is important at this point to state that such restructure creates a new contract between the parties, approved by the Court, on a fixed term and amount so that the repayment of such new obligation is from the rehabilitated Debtor's business. *In re Herron,* 60 B.R. 82, 84 (Bankr.W.D. La.1986), states the applicable law as follows:

> "Once a plan is confirmed, the preconfirmation debt is 'replaced' with a new indebtedness as provided in the confirmed plan. The new indebtedness is in essence a new and binding contract between the debtor and the creditors. Upon confirmation the debtor is free to conduct business and, as a consequence,

is similarly liable for post-confirmation obligations and conduct."

Yet the Debtor, despite such new contract, seeks to preserve to itself the right to independently continue litigation against Eastside on the claim and assert that after such litigation it would then ask this Court to reconsider the claim under Bankruptcy Rule 3008.

Obviously, and the Debtor so admits, the claim of Eastside is placed in issue in the state court action, which, the Debtor contends "will determine what amount, if any, the Debtor is entitled to by reason of its tort claim". Such action, in my belief, flies contrary to Section 1123(b)(3)(A) which provides a *plan* may provide for settlement or adjustment of any claim or interest belonging to the Debtor of the estate and Section 1129(b), which allows this court to cramdown such debt restructure upon creditors over their dissent. I find it is not good faith under this Plan from all the circumstances for the Debtor to invoke cramdown against Eastside, while independently prosecuting its state court claim against the Creditor.[3] If the Debtor, as the Plan states, feels so confident that it can adjust its entire claim against Eastside in state court, it should be left to do so in that forum, without seeking the benefits of Chapter 11 in this Court in order to keep its business in tact. The Plan, to be confirmed on this issue, will take action by the Debtor to seek full relief under Chapter 11 either by dismissing its state law claim or dismissal of this proceeding. I caution that this holding is peculiar to the facts in this case, and certainly a Plan which has as its ger-

---

**3.** A legal argument could be made that under the supremacy clause of the U.S. Constitution, Art. VI, cl. 2, which prevents a state from enacting bankruptcy legislation that conflicts with an area acted upon by Congress, *In re Pelter,* 64 B.R. 492, 494 (Bankr.W.D.Okl.1986), that since Congress has provided to a debtor the remedy to adjust creditors rights, such remedy is exclusive, and no state action can frustrate or burden that federal purpose. The supremacy clause covers state tort actions created by state courts. *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), which holds:

> "Thus the question whether state action is preempted by federal law is one of Congressional intent. 'The purpose of Congress is the ultimate tombstone.' (Citing cases.).

> \* \* \* \* \* \*

> In such instances courts sustain a local regulation 'unless it conflicts with federal law or would frustrate the federal scheme, or unless the court's decision from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the states.' *Malone v. White Water Corp.,* 435 U.S. [497] at 504 [98 S.Ct. 1185, at 1189–90, 55 L.Ed.2d 443].

> \* \* \* \* \* \*

> If the state tort law purports to define the meaning of the contract relationship, that law is pre-empted." *Id.* at 208–09, 213, 105 S.Ct. at 1909–10, 1912.

mane provision the recovery of assets through litigation to refinance or restructure its business may very well be confirmed under the good faith provision. Here the Debtor has expended great effort in this Court to settle and adjust the Eastside claim under the Plan, not from the litigation but from its on-going business. Litigation is not essential to such Plan.

IT IS ORDERED the Debtor's Plan of Reorganization is denied confirmation with leave of the Debtor to amend the Plan within 14 days.