**In re Lowell D. HENKE, Debtor.**

**Bankruptcy No. 87–40497.**

United States Bankruptcy Court,
D. Montana.

Sept. 1, 1988.

See also 84 B.R. 693.

John W. Larson, Missoula, Mont., for debtor.

Doug James, Billings, Mont., for John Hancock.

Daniel P. McKay, Great Falls, Mont., for Larry Semenza.

### ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this Chapter 11 case, hearing on confirmation of the Debtor's second and final Plan of Reorganization together with objections filed by John Hancock Mutual Life Insurance Company (Hancock) and Larry Semenza (Semenza) was held June 16, 1988. Post hearing memorandums have now been filed by the Debtor and objecting creditors which raise issues dealing with acceptance and cure of default of an executory contract between the Debtor and Semenza, whether the Plan is fair and equitable under § 1129(b), and feasibility. Hancock's claim is $1,237,678.96, of which it is conceded by the parties that $900,000.00 is secured by real property. Thus, Hancock is an unsecured creditor in the sum of $337,678.96, and has voted to reject the Plan. Semenza contends that the acceptance of his executory contract lacks proof of adequate assurance of future performance or compensation for pecuniary loss in the nature of attorney fees.[1] Ballots received by the clerk are as follows:

| Class | Creditor | Amount | Vote |
|---|---|---|---|
| 4—Secured | Hancock | $900,000.00 | Rejects |
| 5—Secured | Farmers State Bank | 100,000.00 | Accepts |
| 8—Unsecured | Semenza | 226,013.14 | Rejects |
| | Hancock | 337,678.96 | Rejects |

Farmers State Bank is a secured creditor which is impaired under the Plan. Since at least one impaired class of creditors has affirmatively voted in favor of the Plan, Section 1129(a)(10) has been satisfied. *See,* *In re Douglas Hereford Ranch, Inc., et al.,* 76 B.R. 781, 4 Mont.B.R. 162 (Bankr. Mont.1987).

The Debtor has been engaged in farming for over 30 years, and presently operates a

---

**1.** Semenza has filed a separate motion for attorney fees. This matter will be treated post confirmation.

---

farm in Toole County, Montana, consisting of 4,518 deeded acres, of which 2,550 acres are cropland. Debtor raises wheat on 1,143 acres and barley on 614 acres. In 1986, he raised and sold crops for $163,664.00 and in 1987 for $118,000.00. He has used his 1986 crop yield for future projections because it was a more representative year, free of drought experienced in 1987. Government farm subsidy payments approximate $56,000.00 per year, and annual storage payments for grain are estimated at $6,000.00.

In addition to the Debtor's primary occupation as a farmer, the Debtor some 15 years ago invented a device called the "Idler Timer" which is used by manufacturers and owners of diesel trucks to economize on fuel while the truck is idling. Debtor sells the timing device from his family home, and such income is wholly independent of his farm income. The income from the patented device has been a source of substantial and steady income to the Debtor. In 1988, his sales for the first five months of 1988 equal $38,000.00, and his last three years' average profit has been $40,000.00 per year. As a result, the Debtor has projected income from the timing device for the years 1989 and forward at $60,000.00 per year. This income is being placed into the Plan projections to augment money available to pay creditors under the Plan.

Under the proposed Plan, the Debtor projects 1989 cash flow of $300,664.00, with expenses estimated at $122,000.00. From the net income of $178,664.00, Debtor proposes payments as follows:

| | | |
|---|---|---|
| Hancock | — | $95,472.00 |
| Farmers State Bank | — | 18,318.72 |
| Car loan | — | 1,000.00 |
| Unsecured creditors | — | 10,000.00 |
| Interest to unsecured creditors | — | 20,260.73 |
| Payments to Semenza | — | 25,400.00 |

Hancock's secured claim is restructured on a 30 year amortization at 10% interest per year with a balloon payment at the end of 17 years. Farmers State Bank loan is rewritten over seven years at 10.75% interest

per year. Semenza's claim will be paid in accordance with the contract terms of semi-annual payments of $12,854.67. Cure of the present default would be made by payment of $38,564.00 in 1988. Semi-annual payments have commenced as of June 21, 1988. Debtor's cash flow analysis for 1988 shows he will have $191,600.00 available for debt service. Payments to unsecured creditors bear interest at 6%.

Under the Plan all creditors, including Hancock's unsecured claim, would be paid in full in the 17th year. Testimony from the Debtor's expert witness reveals that based on 30 years of historical data of agricultural land values, the Debtor's $900,000.00 farm will increase in value at the rate of 4 to 6% per year, so that by the year 2008, the value of the farm will be just under 2 million dollars. As a result, the Debtor and his expert witness contend that an agricultural loan of 60% of value would be available to make the balloon payments. No other testimony was introduced in opposition to the Debtor's evidence, and I find the evidence of the Debtor is credible.

It is well established that the Court has a mandatory, independent duty to determine whether Section 1129(a) and (b) requirements have been satisfied under the Plan, irrespective of whether a valid objection has been raised or filed. *In re Martin*, 66 B.R. 921, 928 (Bankr.Mont.1986). On the issue dealing with the fair and equitable test, known as the absolute priority rule, the seminal case of *Norwest Bank Worthington, et al. v. Ahlers*, — U.S. —, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), held:

"As the Court of Appeals stated, the absolute priority rule provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan. *Id.* [*In re Ahlers*, 794 F.2d 388] at 401 [ (8th Cir.1986)]. The rule had its genesis in judicial construction of the undefined requirement of the early bankruptcy statute that reorganization plans be 'fair

and equitable'. *See, Northern Pacific R. Co. v. Boyd*, 228 U.S. 482, 504–505 [33 S.Ct. 554, 560, 57 L.Ed. 931] (1913); *Louisville Trust Co. v. Louisville, N.A. & C.R. Co.*, 174 U.S. 674, 684 [19 S.Ct. 827, 830, 43 L.Ed. 1130] (1899). The rule has since gained express statutory force, and was incorporated into Chapter 11 of the Bankruptcy Code adopted in 1978. See 11 U.S.C. § 1129(b)(2)(B)(ii) (1982 ed., Supp. IV). Under current law, no Chapter 11 reorganization plan can be confirmed over the creditors' legitimate objections (absent certain conditions not relevant here) if it fails to comply with the absolute priority rule." — U.S. at —, 108 S.Ct. at 966.

As the court further noted, an exception to the rule was expressed in dicta in *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), which stated the absolute priority rule did not bar debtors from retaining their equity interest in the reorganized entity if they contributed "money or money's worth" to the reorganized enterprise. However, in *Ahlers*, the Supreme Court specifically refused to rule on the question whether the *Los Angeles Lumber* "exception" was codified in the 1978 Code, thus leaving the split of authority among the lower courts unresolved. *Ahlers*, supra, ftn. 3, — U.S. at —, 108 S.Ct. at 967, citing *In re Sawmill Hydraulics Inc.*, 72 B.R. 454, 456 and n. 1 (Bankr.C.D.Ill.1987) and *In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 833 (Bankr.S.D.N.Y.1982). The exception is brought into play by the Debtor as an alternative to the unsecured class (Hancock)[2] receiving full value of its allowed claim. The Debtor contends that his contribution to capital of the farm operation to pay creditors from the Idler Timer sales satisfies the *Los Angeles Lumber* exception. That issue may be deferred if the dissenting unsecured class of unsecured creditors are paid in full in an amount equal to the present value of each claim. § 1129(b)(2)(B)(i) states a Plan may be confirmed over the objections of a dissenting class if—

---

**2.** While Semenza is treated in the unsecured class for purposes of voting, his claim will be paid in full according to the terms of the contract.

"(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim;"

As stated in *Klee*, All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code, 53 *The American Bankruptcy Law Journal*, 133, 143–44 (1979):

> "The plan may be confirmed notwithstanding the dissent of a class of unsecured claims, only if one of two standards is satisfied. First, the plan may provide for members of the class to receive or retain property that has a present value equal to the allowed amount of their unsecured claims."

The second alternative is not applicable in this case because the Debtor as owner and junior to the unsecured class of creditors will retain the farm property under the Plan. *Ahlers*, supra, —— U.S. at ——, 108 S.Ct. at 966 (There is little doubt that a reorganization plan in which respondents retain an equity interest in the farm is contrary to the absolute priority rule).

■ The issue of present value is raised by Hancock in its unsecured creditor's status when it complains that payment of the unsecured claim at 6% is below the existing market rate of interest or discount rate. As stated in *In re Martin*, supra, at 927, discussing present value:

> "[T]his contemplates a present value analysis that will discount value to be received in the future; of course, if the interest rate paid is equivalent to the discount rate used, the present value and full future value will be identical. Normally, the interest rate used in the plan will be prima facie evidence of the discount rate because the interest rate will reflect an arms length determination of the risk of the security involved and feasibility considerations will tend to understate interest payments. H.R.Rep. No. 595 at 414–15, 1978 U.S.Code Cong. & Ad.News at 6370–71; *In re Ahlers*, supra, at 401 ftn. 15."

In a number of recent farm cases, including *Martin*, supra, this court has held "the proper rate of interest is the prevailing market rate of interest which the debtor would pay a commercial lender for a loan of equivalent amount and duration, considering the risk of default and any security". *In re Foster*, 79 B.R. 488, 5 Mont.B.R. 108 (Bankr.Mont.1987); *In re Janssen Charolais Ranch, Inc. (Janssen II)*, 83 B.R. 743, 5 Mont.B.R. 81 (Bankr.Mont.1987); *In re John Martin*, 78 B.R. 598, 4 Mont.B.R. 513 (Bankr.Mont.1987); *In re Paddock*, 81 B.R. 51, 5 Mont.B.R. 147 (Bankr.Mont.1987). In *In re Chaney*, 87 B.R. 131, 6 Mont.B.R. 33, 37–38 (Bankr.Mont.1988), I held:

> "I conclude that a prime rate of interest plus a risk factor should be the commercial rate in a reorganization proceeding. *In re Cool*, supra [81 B.R. 614 (Bankr. Mont.1987)]. The risk factor is to be determined on a case-by-case basis depending on the nature of the security and risk of default. *In re Cool*, supra."

This approach is compatible with the recent holding of *Patterson v. The Federal Land Bank (In re Patterson)*, 86 B.R. 226 (9th Cir. BAP 1988). (Since the market rate is influenced by the prime rate, the prime rate may be used as a basis for an interest calculation. *See, In re Lewis Industries*, 75 B.R. 862, 870 (Bankr.D.Mont.1987)). And, it makes no difference that this issue arises under the cram-down provisions of Chapter 11 as opposed to the provisions of Chapter 12, because, as stated in *In re Camino Real Landscape Maint. Contractors, et al.*, 818 F.2d 1503, 1504 (9th Cir.1987):

> "Congress used the phrase 'value, as of the effective date of the plan' in other sections of the Code that have nothing to do with deferred payment of taxes so that Congress presumably intended the phrase to have a single meaning in all cases, including this one."

Since the 6% rate of interest proposed under the Plan is below the prime rate of interest, it does not provide the dissenting members of the unsecured class the allowed amount of their claim as required by § 1129(b)(2)(B)(i). The Plan is thus nonconfirmable on this alternative ground.

Therefore, the rejection of the Plan under § 1129(b)(2)(B)(i) brings the court squarely into *Los Angeles Lumber* case exception to the absolute priority rule. *Klee*, supra, writes at 142:

"The Code is fairly explicit in specifying whether a plan is fair and equitable with respect to a dissenting class. The statute states that the requirement that a plan is fair and equitable 'includes' several factors. However, the legislative history makes clear that some factors which are 'fundamental' to fair and equitable treatment of a dissenting class were omitted from the statute to 'avoid complexity'. [124 Cong.Rec.H. 11,103 (daily ed. Sept. 28, 1978), at 11,104; 124 Cong. Rec.S. 17420 (daily ed. Oct. 6, 1978) at 17420.]" [3]

Section 1129(b)(2) states:

"For the purpose of this subsection, the condition that a plan be fair and equitable with respect to class includes the following requirements:"

■ The Code contains a rule of construction that "includes" is not limiting. *Klee*, supra, at 142, Ftn. 72, for § 102(3) states:

"(3) 'includes' and 'including' are not limiting;"

Thus, proper statutory construction dictates that by using the term "includes" in § 1129(b)(2), Congress clearly intended that the examples set forth in that section are not limiting but rather invite an open ended approach; such as the exception set forth in *Los Angeles Lumber*. Not only does this result comport with legislative intent and history, but as a practical matter, the infusion of new capital in a reorganized entity to keep the enterprise alive is a desirable, and compatible, approach to a Chapter 11 reorganization effort. Thus, I adopt the rationale of *In re Potter Material Service, Inc.*, 781 F.2d 99 (7th Cir.1986), which holds in discussing § 1129(b)(2)(B)(ii):

"An equity-interest owner may retain an interest in the debtor corporation so long as the owner invests new capital into the corporation. See *Case v. Los Angeles Lumber Products Co. Ltd.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939); *In re Landau Boat Co.*, 13 B.R. 788 (Bankr.W. D.Mo.1981); *In re Marston Enterprises*, 13 B.R. 514 (Bankr.E.D.N.Y.1981). The new capital investment must (1) represent a substantial contribution and (2) equal or exceed the value of the retained interest in the corporation.[4] *See, Case*, 308 U.S. 121, 60 S.Ct. at 10; *Landau Boat*, 13 B.R. at 792–93; *Marston Enterprises*, 13 B.R. at 518." *Id.* at 101.

Further:

"The Supreme Court set out the appropriate standard for evaluating a company, undergoing reorganization in *Consolidated Rock Products Co. v. DuBois*, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941). The court said:

"The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable. Since its application requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made. But that estimate must be based on *an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth*, including, of course, the nature and condition of the properties, the past

---

**3.** Both the House and Senate report read:
"Although many of the factors interpreting 'fair and equitable' are specified in Paragraph (2), others, which were explicated in the description of Section 1129(b) in the House report, were omitted from the House Amendment to avoid statutory complexity and because they would undoubtedly be found by a court to be fundamental to 'fair and equitable' treatment of a dissenting class."

**4.** The fact that *Potter* talks in terms of a corporation as a debtor is unimportant, for an individual person may also be a debtor under Chapter 11. *See*, § 101(12) and (33). Further, in the original Senate version of the 1978 Code, 1129(b) was applicable to only a "public company". S. 2266, § 1130(b). The Senate bill acceded to the House bill, H.R. 8200, which applies to any debtor, including an individual farmer.

earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance. A sum of values based on physical factors and assigned to separate units of the property without regard to the earning capacity of the whole enterprise is plainly inadequate.... The Circuit Court of Appeals correctly left the matter of formal apprisal to the discretion of the District Court. *The extent and method of inquiry necessary for a valuation based on earning capacity are necessarily dependent on the facts of each case. Id.* at 526–27, 61 S.Ct. at 685 (citations omitted) (emphasis added)." *Id.* at 104.

It is conceded by Hancock that if the Plan is rejected and liquidation of the assets ensues, it would not recover any money on its unsecured claim. To avoid this eventuality, the Debtor proposed to invest from his non-farm patent income, the sum of $40,000.00 to $60,000.00 per year. The Plan provides, as to unsecured creditors:

"Unsecured creditors shall be paid 100% of their allowed claims on a pro-rata basis at 6% interest. The final amount as allowed and ordered paid by the court on these claims shall be paid over 17 years. During the first seven years of the Plan, the unsecured creditors will receive their pro-rata portion of a $10,000.00 minimum annual payment. Any remaining debt to the unsecured (sic) will be paid seventeen years from the date the confirmed plan becomes final."

The Debtor's new contribution to the reorganized entity from the Idler income will equate to at least $680,000.00, which far exceeds the unsecured principal debt. The contribution is thus substantial. In addition, at the end of the 17 year term, the farm will be re-mortgaged to pay all existing claims in full. This proposal is also a substantial contribution of new mortgage money. Clearly, the new capital investment will equal or exceed the value of the retained interest, which at present is zero. Even at maturity of the Plan the value can be estimated at less than the amount of the claims paid in full. As an example, the balance of the secured debt due Hancock after 17 years is $690,711.23 principal, so that coupled with an unsecured debt of over $550,000.00, the equity left to the Debtor would be less than the amount of the contribution, after the new mortgage is obtained to fund the full payment of all creditors. I find and conclude, therefore, that the proposed Plan of Reorganization satisfies the absolute priority rule within the exception announced and permitted in *Potter Material,* supra, and *Los Angeles Lumber,* supra, as an alternative to section 1129(b)(2)(B)(i).

The remaining issue raised by the objecting creditor concerns § 1129(a)(11), which requires the Plan be feasible. Again, quoting from *In re Martin,* supra at 925, it was held:

"The Plan must be feasible, that is, confirmation of the Plan under Section 1129(a)(11) is not likely to be followed by liquidation or the need for further reorganization of the Debtors. *In re Prudential Energy,* supra, holds [58 B.R. 857] at 862–63 [ (Bankr.S.D.N.Y.1986) ]:

'Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under 1129(a)(11). Most Debtors emerge from reorganization with a significant handicap. But a plan based on impractical or visionary expectations cannot be confirmed. (Citing cases and authority). All that is required is that there be a reasonable assurance of commercial viability. *In re Trail's End Lodge [Inc.],* 54 B.R. [898] at 904 [Bankr.Vt.1985]'

Further, *In re Clarkston,* 767 F.2d 417, 420 (8th Cir.1985), states:

' * * * The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts. *In re Bergman,* 585 F.2d 1171, 1179 (2nd Cir.1978) (quoting 9 *Collier on Bankruptcy* at 1139). Pertinent factors to be considered include the business's earning power, the sufficiency of the capital structure, economic conditions, managerial efficien-

cy, and whether the same management will continue to operate the company. *In re Great Northern Protective Services, Inc.,* 19 B.R. 802, 803 (Bankr.W. D.Wash.1982).'"

The cash flow analysis of the Debtor, not refuted by any credible evidence from the objecting creditors, reflect conservative estimates of crop yields and income. While the creditors argue the projections are based on a 1986 year, which is higher than the 1987 year, the 1986 income of $163,000.00 does not include proceeds from hail damage of $34,000.00. In all cash flow projections Debtor has estimated crop income at levels below what was actually sold and produced during 1985 or 1986. Thus, historic farm precedent is the basis for the projections. Indeed, the objecting creditor Semenza testified at an earlier hearing on relief from the stay that the 1982 crop was in excess of $200,000.00 and that an additional $65,000.00 from grazing could be anticipated. Further, prices for barley ($2.10 to $1.70 per bushel) and wheat ($4.00 per bushel) are based on averages obtained over the recent past and reflect reasonable future projections. On the other side of the ledger, expense projections are based on historic patterns, and none have been challenged by the creditors. Therefore, I conclude the Plan is feasible.

Upon review of the record, I find each element of Section 1129(a) and (b) have been satisfied, where applicable. For example, Section 1129(a)(7), known as the best interest of creditors tests, is met because each unsecured creditor will clearly receive more under the Plan than upon liquidation of the farm assets.

After notice and hearing, I find and conclude:

(1) The Plan complies with the applicable provisions of this title.

(2) The proponent of the Plan complies with the applicable provisions of this title.

(3) The Plan has been proposed in good faith and not by any means forbidden by law.

(4) Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with, the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable; and

(5)(A)(i) The proponent of the Plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint plan with the Debtor, or a successor to the Debtor under the Plan; and

(ii) the appointment to, or continuance in such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B) the proponent of the Plan has disclosed the identity of any insider that will be employed or retained by the reorganized Debtor, and the nature of any compensation for such insider.

(6) Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the Plan; or

(ii) will receive or retain under the Plan on account of such claim or interest property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under Chapter 7 of this title on such date; or

(B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the Plan on account of such claim property of a value, as of

the effective date of the Plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

(8) With respect to each class of claims or interests—

(A) such class has accepted the Plan; or

(B) such class is not impaired under the Plan.

(9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that—

(A) with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of this title, on the effective date of the Plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B) with respect to a class of claims of a kind specified in section 507(a)(3), 507(a)(4), 507(a)(5) or 507(a)(6) of this title, each holder of a claim of such class will receive—

(i) if such class has accepted the Plan, deferred cash payments of a value, as of the effective date of the Plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the Plan, cash on the effective date of the Plan equal to the allowed amount of such claim; and

(C) with respect to a claim of a kind specified in section 507(a)(7) of this title, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the Plan, equal to the allowed amount of such claim.

(10) If a class of claims is impaired under the Plan, at least one class of claims that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider.

(11) Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debt-

or under the Plan, unless such liquidation or reorganization is proposed in the Plan.

(12) All fees payable under section 1930, as determined by the court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the effective date of the Plan.

(13) The Plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title [11 USCS § 1114], at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title [11 USCS § 1114(e)(1)(B) or (g)], at any time prior to confirmation of the Plan, for the duration of the period the debtor has obligated itself to provide such benefits.

(14) The provisions of Section 1129(b) have been satisfied in that the Plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan.

IT IS ORDERED that the Plan of Reorganization of Lowell D. Henke is confirmed.