**In re Fred W. COOL, Lois E. Cool, Debtors.**

**Bankruptcy No. 87–40154.**

United States Bankruptcy Court, D. Montana.

Dec. 11, 1987.

Joseph W. Duffy, Great Falls, Mont., for debtors.

Malcolm Goodrich, Billings, Mont., for FLB.

George Darragh, Asst. U.S. Atty., Great Falls, Mont., for FmHA.

Dunlap & Caughlan, Butte, Mont., trustee.

ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this Chapter 12 case, hearing on the Debtors' Amended Plan was held on October 29, 1987, together with objections to the Plan filed by the Federal Land Bank of Spokane (FLB) and the Farmers Home Administration (FmHA). The FLB's objection can be trifurcated into (1) feasibility, (2) valuation and (3) market rate of interest. The FmHA's objection was based on the interest rate used for deferral of its debt. The Debtors consent to curing the FmHA objection, and argue that the FLB objections should be denied.

Debtors operate a 720 acre dryland farm in Valley County, Montana, on which they grow wheat and barley. Debtors list secured creditors totaling $177,628.40, tax claims of $16,732.00, and unsecured claims of $20,752.00. The Debtors' Plan projects income, both from farm and non-farm, of $59,504.00 to $56,058.00 for the years from 1988 to 1992. Net income ranges from $16,338.00 to $14,711.00 for the same years, while Plan payments, based on Debtors' valuations range from $14,396.00 in 1988 to $13,196.00 in 1992. The income and expense projections show a cash balance on hand in 1988 of $10,331.00, dropping to a mere $855.00 at the end of the term of the Plan. It is apparent therefore that the feasibility of the Plan, i.e., the Debtors' ability to make payments under the Plan is directly tied to the valuation of the Debtors' farm. The valuation fixed by the Debtors appraisal based on an income approach is $51,000.00, while the FLB fixes the value based on a market data approach at $109,000.00.

The FmHA's objection is based on the Debtors' use of an interest rate of 5% on its secured claim of $14,320.00. The FmHA entered testimony of its loan specialist that the rate of 5.75% was a fixed interest by FmHA regulations for the type of renewal sought under the Plan. The Debtors agreed to such rate figure, but proposed to pay the debt at 5% interest with a balloon of the additional ¾% at the end of the Plan. This Court finds that the interest rate of 5.75% is the only available rate allowed by regulations and must be included in the Plan at that annual rate.

The FLB's objection to feasibility is based largely on the testimony of its expert witness, Dr. Casavant. Dr. Casavant based much of his feasibility opinion on the assumption that the Debtors should pay an interest rate of prime plus 4 percentage points as the market rate of interest rather than 8.5% proposed in the Debtors' Plan. At the rate proposed in the Plan, together with the Debtors' valuation, the Debtors' income and expense projections as noted above show a balance carried forward of cash for every year of the Plan. The Debtors credibly explained both the income and expense projections so that this Court finds them reliable. However, even if reliable, the question of feasibility still turns on what value the Court fixes for the farm.

On the issue of valuation, the FLB and Debtors presented expert appraisal testimony on the value of the Debtors' real property and improvements. Section 11 U.S.C. 506(a) governs the proper approach to valuation. *In re Robinson Ranch*, 75 B.R. 606, 4 Mont.B.R. 411 (Bankr.Mont. 1987); *In re Foster*, 79 B.R. 906, 5 Mont.B. R. 108 (Bankr.Mont.1987). As stated in *Foster*, quoting *Robinson:*

"The starting point on valuation is Section 506(a) of the Code which states:

'§ 506. Determination of secured status.

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property,

and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.'

In Chapter 12 cases where the property will be held as a going-concern for the production of income to pay reinstated mortgages and subsequent debts, the value under 11 U.S.C. 506(a) should be based on a fair market value, not a liquidating value. *In re Yoder*, 32 B.R. 777 (Bankr.W.D.Pa.1983); *In re Fursman Ranch*, 38 B.R. 907, 909 (Bankr.W.D.Mo. 1984):

'This court is obliged to value collateral "in light of the purposes of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing—on the plan affecting such creditor's interest". The legislative history suggests that the valuation is to be made on a case by case basis, consistent with the time of the valuation. Senate Report No. 95–989, 95th Cong.2d Sess. (1978) 68, U.S.Code Cong. & Admin.News 1978, p. 5787, reported in App. 3 *Collier on Bankruptcy*, (15th Ed.); * * *.'

See also *In re Martin*, 66 B.R. 921, 927 (Bankr.Mont.1986). The valuation for the purposes of 1225(a)(5)(B)(ii) is to be fixed 'as of or close to the effective date of the Plan'. *In re Cook*, 38 B.R. 870 (Bankr.Utah 1984). In regard to value, *In re Courtright*, 57 B.R. 495, 496 (Bankr.Or.1986), states:

'The court believes that it should start with the fair market value of the property as that term is generally understood to be, i.e., the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time. The court should not use that value which would be obtained through a forced or quick sale.'

The appraiser for Metropolitan expanded on such definition to include that the buyer should be knowledgeable of all uses and purposes for which the property is adapted and for which it was or is capable of use. Three approaches to fair market value are generally recognized, to-wit: (1) the market data or comparable sales approach; (2) the income approach, and (3) the cost or replacement approach."

The FLB's expert, Phyllis L. Sethre, valued the property as follows:

| | | |
|---|---|---|
| (1) | Sales Data Approach | $109,080.00 |
| (2) | Income Approach | 95,400.00 |
| (3) | Cost Approach | 119,120.00 |

The Debtors' expert, Phillip E. Olmstead, valued the property as follows:

| | | |
|---|---|---|
| (1) | Market Approach | $ 61,200.00 |
| (2) | Income Approach | 51,000.00 |

While Ms. Sethre considered all three valuations, she selected the market data value as the final appraised value of $109,000.00. Mr. Olmstead used a final appraisal value of $51,000.00 based on the income approach. The Debtors' appraiser's valuation in this case on the income approach as well as FLB's appraisal point up the failings made by appraisers in cases where the appraiser attempts to capitalize the profits of the particular farm operation as opposed to fixing the intrinsic value of the land based on production or reasonable rental value. A discussion of the legal principles involved on the proper application of the income approach is thus warranted. While the legal principles are taken from cases and text authority involved for valuation in eminent domain cases, the rationale is nevertheless applicable in the present context because the appraisers theoretically are attempting to invoke the same principles. In the legal treatise, 27 Am.Jur.2d, *Eminent Domain*, § 286, P. 87 (1966), the text states in discussing the capitalization of income approach:

"§ 286.—Income or rentals; capitalization. As a general thing, the productive value of land, or the value to its owner based on the income he is able to derive from his use of the land, is not the measure of compensation and is not material except so far as it throws light upon the market value. Where such income is derived from the intrinsic nature of the

property itself, and not from a business conducted on the property, the courts, as a general rule, accede to the view that income from property in the way of rents and profits is an element of consideration in arriving at the market value or measure of compensation to be paid.

The valuation of condemned property by capitalizing the net rents is said to be an accepted method of valuation. Indeed, it is said to be generally conceded that with respect to properties owned for income purposes the capitalization of income is the preferable method for calculating value, if due consideration is given to the other pertinent factors. It involves capitalizing the net income that the property can fairly be expected to produce, and the rate of capitalization is the percentage of return on his investment that a willing buyer would expect from the property. However, the capitalization-of-income method should be carefully scrutinized even where appropriate. While it may be the only usable method under certain circumstances, its use must be based on a foundation which minimizes conjecture and uncertainty."

The legal principles are further developed in the case of *State of Montana v. Bare*, 141 Mont. 288, 377 P.2d 357, 363 (1962), where the Court quoted from the 1963 Report of the Committee on Condemnation and Condemnation Procedures of the Section of Local Government Law of the American Bar Association at page 38:

"Admittedly the best method of arriving at market value is the use of recent sales of comparable property. Additionally, the 'income method' may be used to determine market value, where appropriate. In fact the income producing capacity of real estate is one of the most, if not the most important consideration in determining the value of real estate. However, the majority of courts restrict this type of testimony. This stems in part from the principle that business profits are considered too speculative to be considered in determining value, and partly because courts view comparable sales as a more objective test. Rental property, however, is an exception to this rule. If the monthly or annual rental can be proved with a reasonable degree of certainty, in the absence of other evidence, courts will consider it as a factor in determining value. Normally the rental will be projected according to the going rate of interest in the financial community."

*Bare* commented:

"While we do not reject the method in all cases, we believe for future guidance in eminent domain cases, the capitalization of income method should be carefully scrutinized even where it may be appropriate as one of the tools of the judicial workshop. We are aware that in some instances, where no comparable sales evidence is available or where it is shown to be not applicable for many reasons, the only useable method is the capitalization method. However, its use must be based on a foundation which minimizes to the extent possible conjecture and uncertainty." *Id.* 377 P.2d at 363.

*Bare* correctly held that the very foundation of the capitalization of income method is from a basis of invested capital in the land, not in a business venture operating from the land. This distinction is critical. Another court in the case of *State of Oregon v. Cerutti*, 188 Or. 103, 214 P.2d 346, 350 (1950), which, like *Bare*, also involved agricultural land, held:

"The weight of authority seems to support the view that evidence of profits derived from the use of agricultural land is relevant to the question of market value and therefore admissible.

\* \* \* \* \* \*

'A court that admits evidence of realized profits derived from a farm may nevertheless exclude estimates of prospective profits on the ground that they are mere guesses. (citing Orgel on Valuation Under Eminent Domain, § 168).'"

The general rule is that evidence of profits derived from a business conducted on the land is too speculative, uncertain or remote to be considered as a basis for computing market value, since such profits depend on

particularized considerations such as market conditions, skill and knowledge of the operation and managerial competency. *State v. Cerutti*, supra, 214 P.2d at 349. *See* Annotation, *Admissibility in Condemnation Proceedings of Opinion Evidence as to probable profits derivable from land condemned if devoted to particular agricultural purposes*, 16 ALR2d 1113, stating:

"* * * the courts, as a general rule, accede to the view that income from property in the way of rents and profits is an element of consideration in arriving at the market value * * * on the ground that such items depend chiefly upon the location, soil and character of the property and are therefore an indication of its value. Thus, there is a clear distinction between income which represents profits earned by a business conducted on the land in question and income which is attributed solely or primarily to the use of the property itself."

*See* also, Annotation, *Distinction between income or profits from business on land and income or profits from use of land, as affecting admissibility of evidence in that regard on question of damages in eminent domain*, 134 A.L.R. 1125.

In *City of Denver v. Quick*, 108 Colo. 111, 113 P.2d 999, 1001 (1941), the Court considered the admissibility of evidence of a cattle and dairy operation conducted on the condemned property, and held:

"Under the record it is here certain that the lands were used by the owners for agricultural purposes and the income in question was derived *from the use of the property itself.* The evidence was offered and expressly admitted as proof bearing on the productiveness of the land taken and its adaptability to livestock husbandry and not as basis for the determination of consequential damages for the destruction of a business as such. (Emphasis in text)."

It is clear from the case authorities that the profit must be certain, have been realized, and based on figures from operations in existence, and cannot be based on prospective profit. Compare, e.g., *U.S. v.*

*Brinker*, 413 F.2d 733 (10th Cir.1969) (anticipated profits from sale of grass seed too speculative) with *State Highway Commission v. Heltborg*, 140 Mont. 196, 369 P.2d 521 (1962) (Careful foundation centered on production and operating figures against earned income to arrive at net income).

Finally, the law is well summarized in *Denver Urban Ren. Auth. v. Berglund–Cherne Co.*, 193 Colo. 562, 568 P.2d 478, 480–482 (1977):

"* * * The capitalization of income approach is utilized by appraisers to formulate an opinion as to value which reflects the net income generated by the property during the remainder of its useful life. The economic rent which the property will command on the open market less deductions for normal operating expenses equals net operating income. To arrive at the fair market value of the property, the net operating income is then capitalized at a rate of return which is anticipated for similar properties.

\* \* \* \* \* \*

The business profit rule * * * requires the exclusion of business profits generated by an enterprise on the property.

\* \* \* \* \* \*

But a critical distinction must be made between 'profits derived from a business conducted on the premises' and 'profits derived from the land itself'. Only the first is inadmissible under the rule. This court has previously held that evidence of farm and rental income is admissible as 'profit derived from the land itself'. (Citing cases)."

Testimony of the two expert appraisers on the income approach shows one used a rental value of the land (Olmstead) while the other (Sethre) used a crop share basis. Ms. Sethre relied heavily, however, on the sales data approach, yet only used three comparable sales to do so. Mr. Olmstead relied solely on the income approach, doing so because of direct contact he made with local bank lenders who stated that farmers must have a cash flow before they would qualify as borrowers. Olmstead stated the Debtors' farm would rent for

$12.00 per acre for the crop land and $10.00 per acre for grazing (based on .35 AUMS), for a total annual rental value of $6,102.78. Sethre pegged the annual income at $5,913.28 based on a crop sharing arrangement. From the gross rental income, the appraiser deducted the following expenses:

| | Ms. Sethre | Mr. Olmstead |
|---|---|---|
| Real Estate Taxes | $1,357.00 | $1,866.00 |
| Insurance | 101.52 | 716.00 |
| Maintenance | 343.50 | 360.00 |
| Management Fee | 295.66 | 300.00 |
| Total | $2,097.68 | $3,242.00 |

Ms. Sethre estimated the expenses for taxes and insurance, rather than use the actual expenses as was done by Olmstead. Had she used the actual expenses to fix her income value, at her capitalization rate of 4%, her value would have been $66,782.00. Because the rental approach basically calls for the owner to be liable for the taxes only, I determine that the value fixed by Olmstead is erroneous. He used a capitalization rate of 5.6% to arrive at his value. After eliminating expenses for insurance, maintenance and management fees, the net income should be $4,236.00, which would bring the value to $75,642.00, or rounded to $75,600.00.

Considering all factors, including the general decline in agricultural land value plus a low availability of comparable sales, and adopting the proper income approach, this Court finds that the valuation of the Debtors' land is properly fixed at $75,600.00.

 The final contested issue is the proposed interest rates set forth in the Plan. As previously addressed, this Court finds that the rate applicable to the FmHA is 5.75%. The Debtors propose to pay the Federal Land Bank 8.5% interest over 20 years. The FLB, on the other hand, offered expert testimony that the prevailing market interest rate on the debt should be set at prime plus four percent. The Plan, as proposed, with an 8.5% interest rate figure, leaves the Debtor with a cash balance forward in each year. The FLB's expert witness, Dr. Casavant, testified that the Debtors' Plan would run at a negative cash flow yearly if the interest rate of prime plus four percent were applied to the FLB's debt.

The issue becomes what interest rate is reflective of the market rate of interest for the present value of deferred payments. Is the Debtors' proposed rate of 8.5% per annum or the FLB's rate of 12¾% (prime of 8¾% plus 4%) the market rate of interest? The Ninth Circuit Court of Appeals recently rendered a decision as to "what rate of interest on deferred payments of federal taxes will provide the government with payments having a present value to the allowed amount of its claim as required by 11 U.S.C. § 1129(a)(9)(c)". *In re Camino Real Land Maint. Contractors, et al.*, 818 F.2d 1503, 1504 (9th Cir.1987). This Court cited the *El Camino* decision favorably in *In re Paddock*, 81 B.R. 51, —— Mont.B.R. —— (Bankr.Mont.1987), and the language of that case is applicable to the case *sub-judice*, for, as the Circuit Court noted:

" * * * Congress used the phrase 'value, as of the effective date of the plan' in other sections of the Bankruptcy Code that have nothing to do with a deferred payment of taxes' so that 'Congress presumably intended the phrase to have a single meaning in all cases, including this one. *Neal* [*Neal v. U.S. Pharmacal Co.*], 789 F.2d at 1288–89; *Southern States* [*In re Southern States Motor Inns* ], 709 F.2d at 651–52, N. 6'. *Id.* at 1506–07. All Circuit Courts, which have rendered a decision on the issue are in agreement that the proper market rate of interest must be decided on a case-by-case basis, from a rule which applies a rate 'the debtor would pay a commercial lender for a loan of equivalent amount and duration, considering the risk of default and any security'. *Id.* at 1504. This Court cited *Camino Real* in its October 28, 1987, decision, *In re Janssen Charolais Ranch, Inc. (Janssen II)*, 83 B.R. 743, —— Mont. B.R. —— (Bankr. Mont.1987). Many points addressed in *Janssen* are applicable in the case *sub-judice*:

'*Camino Real* made other observations in adopting the "open market" standard, namely, (1) the decision

should be made by the Bankruptcy Court on a case-by-case basis, *Id.* at 1508; (2) the debtor's characteristics, i.e., the nature of collateral and risk, determine the rate not the creditor's characteristic, such as cost of money or loan costs, *Id.* at 1506; and (3) the standard of open market is adopted to determine the "value" of the deferred cash payments, irrespective of the financial burden a debtor would have to bear in order to obtain a hypothetical new loan, the latter being irrelevant under the Code. *Id.* at 1505, 1507, N. 2.

"* * * the government concedes in principle that the § 1129(a)(9)(c) rate should reflect the term of deferment of present use and risk of default, as affected by any security * * *." *Id.* at 1507.

For example, *Camino Real* stated in approving a reduction of the rate due to the secured nature of the claim:

"The adjustment was proper because market interest rates are usually lower when a loan is secured. *See Neal,* 789 F.2d at 5288, N. 11." *Id.* at 1507–08. Admitting that the proper rule on interest rates is unanimous among the courts and text authorities, *Camino Real* nevertheless recognizes such "Unanimity disappears upon application * * *". *Id.* at 1505. *See,* e.g., *In re Orosco,* 77 B.R. 246, 252–56 (Bankr., N.D.Cal.1987), holding:

"A number of the secured claimants argue that debtor, being the subject of proceeding under Chapter 11 of the Bankruptcy Code and having the accompanying record of loan defaults, is not a qualified borrower under their standard lending practices and that this fact must be taken into account in the setting of the appropriate interest rate. In support of this contention, the creditors refer to the 'debtor's characteristics' language in the *Camino Real* opinion. The Court does not read the Opinion in this manner. If this were the test, every Chapter 11 debtor would ipso facto be required to pay interest at a rate in excess of market rate without regard to the debtor's financial condition at the time of confirmation, the security, the term of deferment, or the risk of a future default, the very factors which the Ninth Circuit Court emphasized as being of primary relevance."

*Orosco* engaged in an examination of the security and potential risks to the lender in fixing a variable rate of 1½% over a Bank of America reference rate. *Neal,* supra, 789 F.2d at 1286, however, held that since value is to be fixed "as of the effective date of the plan", the statute contemplates the use of a fixed interest rate, as opposed to a variable rate, since a variable or floating rate is not capable of allowing for a determination of present value. A fixed rate is thus mandated by the Code. *In re Lewis Industries,* 75 B.R. 862, 4 Mont.B.R. 434, 444, N. 2 (Bankr. Mont.1987).' " *Id.* at ——.

The evidence presented in this case shows a market rate of interest between 8.5% and 12.75%. The prime rate of interest today is 8¾%. The prime rate is a commercial lending rate which certainly has an impact on the open market. *In re Welco Industries,* 60 B.R. 880, 883 (BAP 9th Cir.1986). In this case, the FLB's expert witness testified that work-out loans would probably be at a lower interest rate than prime plus four. Dr. Casavant further testified that the basis for the lending of agricultural loans in his survey was the lender's situation as to portfolios and aggressiveness. Using the factors of the lender's situation instead of the Debtors is an approach to interest rates that was specifically rejected in *El Camino,* supra, because it involves "creditor characteristics", not lender's rates considering security and risk. This Court once again returns to the basic rule of *Welco,* supra, and it progeny, that prime rate plus a risk factor should be the commercial rate in a Chapter proceeding. The risk factor is to be decided on a case-by-case basis depending on the security and risk of default.

In this case the Debtors owe the Federal Land Bank $92,085.00 which debt is se-

cured by $75,600.00 in real estate. The loan is therefore 100% leveraged, and the extremely tight budget of the Debtors would indicate a risk of default. Accordingly, I fix the market rate of interest at prime plus 1¼%, or 10%, to be paid over 20 years. The Plan, as filed, does not encompass the valuation and interest rates fixed by the Court. Therefore, the Plan must be amended to incorporate the changes. The issue of feasibility will then be tested against the projected income, expenses and Plan payments under the new schedule.

IT IS ORDERED that the Debtors' Second Amended Chapter 12 Plan is denied confirmation, with leave of the Debtors to amend the Plan within ten (10) days of this Order.