In re William A. CHANEY, Lois A. Chaney, Debtors.

Bankruptcy No. 87-20503.

United States Bankruptcy Court, D. Montana.

May 26, 1988.

William L. Madden, Bozeman, Mont., for debtors.

Dunlap & Caughlan, Butte, Mont., Trustee.

Gregory G. Murphy, Billings, Mont., for Federal Land Bank of Spokane.

Malcolm Goodrich, Billings, Mont., for Interstate PCA.

Lisa Swan, Butte, Mont., for Sperry New Holland.

Steven Lobdell, Helena, Mont., for SBA.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this Chapter 12 case, hearing, after notice, was held on December 8, 10 and 18, 1987, on confirmation of the Debtors' Plan, together with objections to the Plan filed by secured creditors Federal Land Bank of Spokane (FLB) and Interstate Production Credit Association (PCA). The issues formed by the objections involve valuation of the farm, the appropriate market rate of interest, feasibility of the Plan, and surrender of PCA stock in partial satisfaction of the debt. Secured claims total $662,528.00 and unsecured claims equal $7,293.00.

Debtors operate a farm of 1,185 acres near Manhattan, Montana, on which they produce wheat, hay, barley and livestock. The Debtors own 355 acres of deeded land, and lease the remaining 830 acres, which leases have been held for 5 to 20 years on a

year to year lease. The claims of the respective secured creditors are:

| | | |
|---|---|---|
| FLB | — | $420,648.25 |
| PCA | — | 101,583.51 |
| SBA | — | 91,300.00 |
| New Holland | — | 21,361.72 |
| Manhattan State Bank | — | 18,000.00 |

The Debtors Plan projects income for the first 3 years of the Plan at $96,150.00, $88,635.00 and $88,684.00, with expenses of $45,500.00 each year. Thus, Plan payments to secured creditors are projected at $42,534.00 for the first year and $40,100.00 thereafter, which results in a carryover reserve in the first year of $5,989.00, $1,834.00 in year 2 and $1,079.00 in year 3. At the hearing, the Debtors' operating statements were amended to include cash on hand of $50,776.00, instead of $13,500.00 projected in the Plan, which causes a $43,-265.00 carryover in year 1 through year 3, when such sum is applied to pay unsecured claims.

The appraisals introduced by the Debtors and Farm Credit Services (FLB) vary substantially. FLB sets the value of land and improvements at $370,000.00, while the Debtors fix the value at $192,000.00. Consequently, Debtors propose to pay the FLB claim of $420,648.25 in the amount of $192,-000.00 over 25 years at 10% interest per annum. The Debtors' appraiser used a market data or comparable sales approach to value on the land and a cost approach on improvements. He values the land at $86,-640.00 and improvements at $105,350.00, for a total value of $192,000.00. In contrast, the FLB appraiser used a market data, cost and income approach to value and then correlated the three values to arrive at a value of $370,000.00.

From the record, the FLB appraiser has more extensive qualifications as a rural appraiser, particularly in the area of accreditation, where he holds a certificate as an accredited Rural Appraiser in the American Society of Farm Managers and Rural Appraisers. The American Society awards accreditation to those members who have completed a series of graduate level courses in rural appraising and passed intensive exams in both the field and classroom. As a matter dealing with credibility, the Debtors' appraiser valued the property on October 1, 1987, at $226,400.00, then "fine tuned" the appraisal downward to $192,000.00, both of which figures are contained in the same appraisal. Such appraiser used incorrect acreages, insufficient land classification, inadequate soils data, and insufficient description of comparable sales, which resulted in downward adjustment of land value on the subject property of 50 to 60%. In that regard, I concur with the FLB appraiser when he opined that such percentage of downward adjustment leads one to question the comparability of each sale to the subject tract.

The market data or comparable sales approach is generally recognized as the best method of arriving at the fair market value of land. *In re Cool*, 81 B.R. 614, 5 Mont.B.R. 183, 188 (Bankr.Mont. 1987). Both appraisers relied heavily on three comparable sales, Sime Ranch to Lerkind, Harrer to Nelson and Aughney to Brainard. In the Sime comparable, FLB pegged the irrigated cropland at $1,300.00/acre, while the Debtors failed to state the per acre value and simply made a "proper adjustment to the Debtors' property of $440.00/acre for the irrigated cropland". The same criticism holds true of the other comparable sales used by Debtors' appraiser. I find the adjustments made by the FLB appraiser on the land provide a more credible base to actual market value. However, such appraisal made downward adjustments for location, soils and water and noted that each comparable reflects a higher value per acre because such lands are more productive in terms of cropland, the subject being 45% cropland and each comparable being above 70% cropland. It is further undisputed from the Debtors' testimony that 120 acres of river pasture are poor quality grazing land, which have little value to the farm as an economic unit. The sales adjustment made by the FLB appraisal included $418.00 in improve-

ments, which clearly must be discounted in arriving at the value per acre of the unimproved land. This is particularly true in this case because the Debtors' tract is substantially overimproved. Therefore, I conclude and find the following values for land, to-wit:

| | | | | | |
|---|---|---|---|---|---|
| Sprinkler irrigated cropland | — | 135 acres at | $900 | = | $121,500.00 |
| Sub irrigated cropland | — | 25 acres at | 750 | = | 18,750.00 |
| Sub pasture | — | 60 acres at | 250 | = | 15,000.00 |
| River pasture | — | 120 acres at | 50 | = | 6,000.00 |
| | | | | | $161,250.00 |

I differ from the FLB appraisal in value of the improvements and land on which the buildings are located. As to the latter item, the FLB appraiser used an irrigated cropland value for 15 acres of building sites, when obviously such land has no such potential use. These 15 acres should bear no greater value than the lowest value of land per acre, or $50.00 per acre, for a total of $750.00 because their use as agricultural land is rendered nil, and any real value will be derived from the sale of the improvements, not the land itself. As to the improvements, I find the cost approach basis using the Marshall–Swift Valuation Service Commercial Manual, with depreciation, gives the fair market value for the improvements. After consideration of the valuation testimony of the two appraisers, I find and conclude the improvements have the following fair market value:

| Improvement | Age | Condition | Value |
|---|---|---|---|
| 1976 home | 11 years | Fair | $43,500.00 |
| 1961 home | 26 years | Good | 32,000.00 |
| 1910 home | 60 years | Fair | 18,000.00 |
| Garage | 60 years | Good | 2,000.00 |
| Machine shed | 17 years | | 3,500.00 |
| Hay shed | Over 20 years | | 350.00 |
| 4 Grain Bins | | | 4,900.00 |
| Corrals & Fencing | | | 1,100.00 |
| | | | $105,350.00[1] |

These values equate to those fixed by the Debtors' appraiser, who has substantial experience as a real estate broker and therefore deals in sales of improved property. It is obvious the farm is overbuilt, and the number of homes on the property must result in a significant discount factor for the improvements.

▮ The recapitulation of the land and improvements is:

| | | |
|---|---|---|
| Land | — | $162,000.00 |
| Improvements | — | 105,350.00 |
| Total | | $267,350.00 |

Since the Plan proposes a repayment on the basis of $192,000.00 rather than $267,-350.00, the Plan will have to be amended to include the above value of the FLB secured claim.

▮ On the interest rate issue, I have previously held that the proper interest rate is the prevailing market rate of interest which "the debtor would pay a commercial lender for a loan of equivalent amount and duration, considering the risk of default and any security". *In re Foster*, 79 B.R. 488, 5 Mont.B.R. 108 (Bankr.1987); *In re Janssen Charolais Ranch, Inc.*, *(Janssen II)*, 83 B.R. 743, 5 Mont.B.R. 81 (Bankr.Mont.1987); *In re John Martin*, 78

---

1. Hog pens included in the FLB appraisal are not owned by the Debtors and are capable of being removed from the property.

B.R. 598, 4 Mont.B.R. 513 (Bankr.Mont. 1987); *In re Paddock*, 81 B.R. 51, 5 Mont. B.R. 147 (Bankr.Mont.1987). I conclude that a prime rate of interest plus a risk factor should be the commercial rate in a reorganization proceeding. *In re Cool*, supra. The risk factor is to be determined on a case-by-case basis depending on the nature of the security and risk of default. *In re Cool*, supra.

The interest rate issue was the subject of extensive testimony presented by the Debtors and FLB/PCA. The Debtors' evidence established through the testimony of an experienced mortgage broker in the area of the Debtors' property that a commercial interest rate from commencial lending institutions such as banks or insurance companies is non-existent, and the current market is set by private lenders extending financing by mortgage or contracts for deed. That interest rate is between 8% and 9% over terms of 15 to 30 years, with an average term being 20 years. Coincidentally, the prime rate of interest at the time of the hearing on confirmation was 8¾% (presently 9%).

FLB/PCA again presented expert testimony from a Washington State University professor who conducted two telephone surveys in the states of Washington, Oregon, Idaho and Montana, from which he concluded that area commercial rate of interest on agricultural loans was commercial prime plus 3% on short term loans and prime plus 4% on long term real estate loans. The second survey resulted in a conclusion that the current rate of interest for agricultural loans is 12.65% to 12.72%. This Court commented on the FLB survey in the cases of *In re Foster*, supra, *In re Paddock*, supra, and *In re Cool*, supra. *Foster*, 79 B.R. 488, 5 Mont.B.R. at 120–121, held:

> "The survey question did not reveal that the debtor was a Chapter 12 debtor, no institutional lender such as FLB or Farmers Home Administration (FmHA) were included, private Contract for Deed rates were not examined or considered, and, finally, the lenders were not asked directly if they were in fact making agricultural loans."

Again, the cross-examination of the FLB/PCA witness developed the survey included only banks in the Bozeman area, and no lending activity of insurance companies, FLB, FmHA, or private contracts for deed. Yet the evidence shows that on a national basis, banks hold only 26% of the outstanding farm loans with the remaining 74% shared by FLB (29.5%), private companies (6.5%), FmHA (15%), and private individuals (23%). According to the Debtors' expert witness, private individuals comprise 90% of the current agricultural lending market, thus the telephone survey ignored in its "universe" between 74% to 90% of the agricultural lenders.

It is further clear from the record that the current FLB interest rate (12.75%), as well as that of PCA, is significantly influenced by reserve for loan losses and cost of operations, which are creditor characteristics which are irrelevant to fixing a market rate of interest. *In re Camino Real Land Maintenance Contractors, et. al.*, 818 F.2d 1503 (9th Cir.1987).

I see no valid reason to change the test developed by this Court in *Foster, Paddock, Jansen II, Martin* and *Cool*, supra. Applying such test, I find and determine that the FLB claim secured by real estate may be paid over 25 to 40 years at 10% interest. The PCA debt of $101,583.51 is oversecured by collateral of a settled value of $190,000.00. Risk of loss on such loan is very unlikely and therefore the prime rate of interest of 9% is a fair market rate of interest to be paid in deferred cash installments over ten years. The interest rate must be set at the date of confirmation in order for the creditor to receive present value of its claim. I further find, and PCA does not contest, that partial payment of such claim may be made by surrender of the present value of the PCA stock owned by the Debtors. *In re Indreland*, 77 B.R. 268, 4 Mont.B.R. 492, 502 (Bankr.Mont.1987), relying on *In re Massengill*, 73 B.R. 1008 (Bankr.E.D.N.C. 1987).

On the issue of feasibility, I start with two quotes. *In re Fowler*, 83 B.R. 39, 5

Mont.B.R. 229, 237 (Bankr.Mont.1987), states:

"I apply the language from *In re Monnier Brothers*, 755 F.2d 1336, 1341 (8th Cir.1985):

'Projecting future income of, and expenses of, an existing farming operation such as debtors' cannot be an exact science.'"

*In re Big Hook Land & Cattle Company*, 81 B.R. 1001, 1007, 5 Mont.B.R. 268, 279 (Bankr.Mont.1988), holds:

"The language of *In re Hansen*, 77 B.R. 722, 727 (Bankr.N.D.1987), is appropriate.

'This Court has indicated on prior occasions that the benefit of the doubt in Chapter 12 cases will be given to farmers, if it appears that a reasonable chance of meeting their payments as projected under a plan. (sic).

\*   \*   \*   \*   \*   \*

The Court believes that the inclement weather conditions of prior years have been wholly outside the control of the debtors, and that, assuming average weather conditions, the Debtors will be able to meet their income and expense projections.'

As held previously by this Court, guaranteed success is not the test or standard. *In re Martin*, 66 B.R. 921 (Bankr.Mont. 1986)."

The Debtors testimony, which I find credible, established that the Plan's projection of income and expenses are on the conservative side, based on historic farm operations over the last twenty years. To illustrate the conservative approach of the Debtors, their income projections for wheat are based upon 50 bushels/acre, whereas, their ASCS rating, based upon historical yields is actually 60 bushels/acre; their income projections for barley are based upon 50 bushels/acre, whereas their ASCS rating, based upon historical yields, is actually 67 bushels/acre; their income projections for hay are based upon 2.5 tons/acre, whereas their actual, historical yield is 3.5—4 tons/acre; their income projections for sale of livestock are based upon 600 lb. calves, whereas their current average weights are 650 lbs.; their income projection for custom haying is $5,000.00, whereas over the last two years they have averaged $5,850.00; their income projection for ASCS government payments is $7,000.00/year, whereas they are currently receiving $15,745.00/year; and their income projections for "Livestock Custom Feeding" is $5,000.00/year commencing in year 3, whereas their actual income based upon current operations, is $8,000.00 for the year. In addition, the Plan's projections are based upon cash on hand of $13,500.00, whereas by the time of hearing the Debtors had cash on hand of $50,766.00.

On the expense side of the ledger, the Debtors have slightly overstated their projected expenses for "fuel, feed, seed, fertilizer and spray" by projecting a level sum of $23,500.00 throughout their Plan, although that figure includes an extraordinary fertilizer expense to be incurred only in the first year of the Plan. The Plan does reflect a reduction from historical expenses for hired labor, because the source of that labor, the Debtors' son, has been paralyzed from the chest down and can no longer work. It does not include line item expenses for replacement cows, replacement bulls or for machinery replacement, because the cost of a replacement calf (600 lbs. @ $.77 = $462.00) is less than that which would be received upon sale of the cull cow (1,200 lbs. @ $.42 = $504.00), and there is sufficient cushion in the underestimated weight of the calves in "Miscellaneous" and in the reserve to be realized in Year 4 and thereafter to cover these expense items. Further, the Plan deliberately omits inflation, because its effect on expenses are counter-balanced by a like effect on income. Inflation as an expense is offset on the income side.

The FLB and PCA presented testimony through their expert economist, John Wicks, that the Plan is not feasible, because in his opinion, several income items are overstated and certain expense items are understated, the net effect of which results in an annual revenue reduction of $5,680.00 before machinery replacement. His estimate for machinery replacement

was between $10,000.00/year and $15,000.00/year, leaving an annual shortfall of between $16,000.00 and $21,000.00.

Debtors established that his criticism of Debtors' income projections, based upon the three years prior earnings shown on Debtors' tax returns, ignored the Debtors' testimony that in one of these years he suffered a calamity which resulted in a significant understatement of his historical, average earnings.

Additional shortcomings are that Mr. Wicks failed to adjust income, especially the ASCS payment, to take into account the Debtors' conservative income projections; that he used a per bushel wheat price of $2.30/bushel, which is significantly lower than the $3.50/bushel average price per bushel during the years 1980–1984, the only years for which statistical evidence was introduced; that he based his machinery replacement cost on the basis of machinery not necessary to Debtors' operation; and that he failed to take into consideration the $3,000.00/year reserve available commencing in year 4.

Mr. Wicks also admitted that his 10% income reduction for calving losses was based upon experience with much larger herds, and that he had no reason to question the Debtors' testimony of a 95% calving success rate over the last 20 years. Furthermore, his testimony that inflation affects only the expense side of the ledger is subject to criticism in light of the witnesses' admission that he didn't know the relationship between the effect of inflation on income as compared with that on expenses. The Debtors' testimony, that its effect is offsetting, is the only credible evidence on this issue.

Nevertheless, as shown by the Debtors, if one adjusts the income and expense figures to take into account both Mr. Wicks' criticism of the Debtors' Operating Statements and the Debtors' conservative income projections, the net effect is a resultant increase in yearly income over the life of the Plan. These adjustments are detailed as follows:

## ADJUSTMENTS TO FARM INCOME (ANNUAL)

a) Crop Adjustments

Wheat

| | | | | | |
|---|---|---|---|---|---|
| Per Plan: | 38 ac. × 50 bu/ac | = | 1,900 bu × $3.00/bu | = | $ 5,700.00 |
| Adjusted: | 38 ac. × 60 bu/ac | = | 2,280 bu × $2.30/bu | = | 5,244.00 |

Net Adjustment ($ 456.00)

Barley

| | | | | | |
|---|---|---|---|---|---|
| Per Plan: | 150 ac. × 50 bu/ac | = | 7,500 bu × $1.50/bu | = | $11,250.00 |
| Adjusted: | 150 ac. × 67 bu/ac | = | 10,050 bu × $1.50/bu | = | 15,075.00 |

Net Adjustment $ 3,825.00

Hay

| | | | | | |
|---|---|---|---|---|---|
| Per Plan: | 260 ac × 2.5 T/ac | = | 660 T × $35/T | = | $23,100.00 |
| Adjusted: | 260 ac × 3.5 T/ac | = | 910 T × $35/T | = | 31,850.00 |

Net Adjustment $ 8,750.00
Less Cattle Feed ( 3,045.00)

$ 5,705.00
Total Crop Adjustment $ 9,074.00

b) Livestock Adjustments

| | | | |
|---|---|---|---|
| Per Plan: | 60 calves × 600 lbs. × .77/lb. | = | $27,000.00 |
| Adjusted: | 57 calves × 650 lbs. × .77/lb. | = | 28,529.00 |

Net Adjustment $ 1,529.00
Less Added Cost of Replacement Cows ( 810.00)

Total Livestock Adjustment $ 719.00

c) Other Adjustments

Per Plan: ASCS $ 7,000.00

| | | |
|---|---|---|
| Adjusted: ASCA Actual | | $15,700.00 |
| | Net Adjustment | $ 8,700.00 |
| | Net Adjustment to Farm Income Excluding Cash on Hand | $18,493.00 |

ADJUSTMENTS TO FARM EXPENSE (ANNUAL)

Electric

| | | |
|---|---|---|
| Per Plan: | | $ 1,600.00 |
| Per Wicks: | | 2,466.00 |
| | Net Adjustment | $ 666.00 |

Repairs

| | | |
|---|---|---|
| Per Plan: | | $ 1,600.00 |
| Per Wicks: | | 3,689.00 |
| | Net Adjustment | $ 2,089.00 |

Misc. (Supplies)

| | | |
|---|---|---|
| Per Plan: | | 1,500.00 |
| Per Wicks: | | 3,248.00 |
| | | $ 1,748.00 |

Machinery Replacement

| | | |
|---|---|---|
| Per Plan: | | — |
| Per Wicks: (10% of 72,275) | | 7,228.00 |
| | Net Adjustment | $ 7,228.00 |

Replacement Bulls

| | | |
|---|---|---|
| Per Plan: | | — |
| Per Wicks: | | 495.00 |
| | Net Adjustment | $ 495.00 |
| | Net Adjustment to Farm Expenses | $12,226.00 |

Adjustments to income show adjustments to projected wheat income to reflect the Debtors' historical yield of 60 bushels/acre and Mr. Wicks' per bushel price of $2.30/bushel; to projected barley income to reflect the Debtors' historical yield of 67 bushels/acre; to projected hay income to reflect Debtors' historical yield of 3.5 tons/acre and Mr. Wicks' reduction of projected hay income for that fed to cattle, resulting in a net increase in crop income of $9,074.00.

The same table, under "Livestock Adjustments", shows a net increase in livestock income of $719.00, arrived at by reducing the number of calves by three to account for Mr. Wicks' desired 10% calving loss, by increasing the weight from 600 lbs. to 650 lbs. to reflect the Debtors' actual calf weights, and by reducing the overall income by Mr. Wicks' figure of $810.00 to account for his added cost of replacement cows. It further shows, under "Other Adjustments", a $8,700.00 net increase in the ASCS payment to bring that income figure into line with the Debtors' actual government payments. The net result of all adjustments is an upward adjustment to annual farm income of $18,493.00.

The Adjustments to Farm Expenses for electric (utilities), repairs, miscellaneous (supplies) and replacement bulls to reflect Mr. Wicks' suggestions, shows that these items, by comparison to prior tax years, were understated in the Plan. The adjustments are based upon Mr. Wicks' actual figures testified to during the hearing. With respect to machinery replacement, the Debtors' testimony as to what items are necessary to his operation results in a total current value of $72,275.00. To this has been applied Mr. Wicks' "rule of thumb" of 10% of that sum per year for machinery replacement, resulting in an annual, machinery replacement expense item of $7,228.00. The total increase in expenses of $12,226.00, leaving a net excess of adjusted income over adjusted expenses on a

yearly basis of $6,267.00 ($18,493.00 — $12,226.00 = $6,267.00).

These adjustments do not reflect any increase to the price of barley or hay, testified to by the Debtor as low; any increase for custom haying, which is low by $850.00; or any increase for livestock custom feeding in year 3, testified to by the Debtor as low by as much as $3,000.00. They also do not reflect any expense adjustment for hired labor, because the Debtor does not have that expense, or for inflation, because its effect on income and expenses are counter-balanced.

■ By using historical averages sufficient cushion has been built into Debtors' Plan to accommodate economic swings. The Adjusted Operating Statements demonstrate that if close to peak income and expense projections are assumed, the Plan is still feasible. Nevertheless, it would not be only dangerous but also erroneous to structure a Plan designed for a 25 year life span on the basis of maximum income and expense projections. There are going to be years of lower income than maximum and of lower expenses than peak. The cash flow projections in Debtors' Operating Statements filed with the Plan provide the greatest assurance the Plan will be fulfilled.

The remaining issue on feasibility which must now be answered is the effect of repayment of the FLB claim of $267,350.00, rather than $192,000.00 as reflected in the Plan. At 10% interest for 25 years, the annual payment must now be $29,162.53 per year. Repayment over 40 years would be $27,269.70. The Plan projected the payment at $21,200.00, thus leaving a shortfall of $7,962.53 (25 year term) or $6,069.70 (40 year term). Total funds available for debt service after adjustments made to income and expenses as outlined above is $94,383.00 in the first year. Payments to creditors would total $50,496.53, without a Trustee's fee of $2,524.00. The Plan is feasible, since at the end of year 1, based on cash on hand of $50,766.00 at the beginning of the year, the reserve to carry forward is reduced from $49,722.00 as projected to $41,363.00 and by the end of year 3 of the Plan, the total cash on hand to pay unsecured creditors is reduced from $50,109.00 to $26,223.00, assuming a 25 year pay out on the FLB claim. After the Plan term, in year 4, the funds available for debt service are $43,617.00, while payments of $50,496.53 must be made. This matter can be handled by reducing the FLB payment until PCA and New Holland are paid in full, when completion of these payments will provide an additional $11,904.00 to pay on the FLB claim. Thus, beginning in year 11 of the payment to FLB, the claim may be retired at about $41,000.00 per year, or over $11,000.00 more per year than the proposed equal annual amortization. Such payments would clearly cover the accruing interest on the claim so as to satisfy § 1225(a)(5). The Plan will have to be amended accordingly, and the parties can then submit their comments and objections to the amendments. I have not by this analysis foreclosed another option to pay the FLB over 40 years, at $21,200.00 per year with a balloon at 25 years. It is for the Debtors to propose the restructure on the claim. I only hold that the claim is capable of being retired on the basis of present income and expense projections.

IT IS ORDERED the Debtors' Chapter 12 Plan is denied confirmation with leave to amend in ten (10) days.