**In re Lars BORG, Vickie Borg, Debtors.**

**Bankruptcy No. 86–40217.**

United States Bankruptcy Court, D. Montana.

July 8, 1988.

Jerrold Nye, Billings, Mont., for debtor.

Gregory G. Murphy, Billings, Mont., for John Hancock Mut. Life.

John O'Keefe, Donald D. MacPherson, Sp. Asst. U.S. Atty., Small Business Admin., Helena, Mont., for SBA.

Dunlap & Caughlan, Butte, Mont., Trustee.

Charles W. Hingle, Billings, Mont., for Navistar Financial Corp. and American State Bank and Trust of Williston, N.D.

Neil D. Enright, Billings, Mont., for Richland Federal CU.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

After due notice, a confirmation hearing was held on August 4, 1987, and October 15, 1987, on the Debtors' Amended Chapter 12 Plan, together with objections to the Plan filed by the Richland Federal Credit Union (RFCU), the American State Bank and Trust of Williston, N.D. (Bank), the Small Business Administration (SBA), the Navistar Financial Corporation (Navistar), the John Hancock Mutual Life Insurance Company (Hancock) and the Farmers Home Administration (FmHA). This Order will address valuation of the Debtors' property and then the objections of the creditors.

The Debtors' operate a 838.5 acre farm near Fairview, Montana, along with a 640 acre state lease. The deeded farm contains

near 700 acres of cropland with the remaining 138 acres being grassland, waste and improvements. The Debtors' produce wheat, barley, hay, beans and raise fox for pelts on the property. The Debtors also receive off-farm income from Mrs. Borg's employment and from oil royalties. The Debtors' projected income and expenses for the first three years of the Plan as follows:

|  | 1988 | 1989 | 1990 |
|---|---|---|---|
| Farm Income | $113,235.25 | $122,661.11 | $132,186.50 |
| Off–Farm Income | 18,360.00 | 18,727.20 | 19,101.74 |
| Total Income | $131,595.25 | $141,338.31 | $151,288.24 |
| Expenses | 99,000.00 | 104,000.67 | 118,000.59 |
| Net Income | $ 32,595.25 | $ 37,387.64 | $ 33,287.65 |

Under the Debtors' Amended Plan,[1] filed July 9, 1987, the Debtors will have total Plan payments, including Trustee's fees, in the first three years of $26,803.25. The Debtors' projections show Plan payments of $28,000.00, with carry-overs of $4,595.25, $6,544.48 and $5,288.24, in years 1 through 3, respectively.

## VALUATION

■ The Debtors and the Hancock each presented an appraisal on the subject property. The Debtors' expert witness used three approaches to value, while the Hancock's expert witness used two approaches. Because Hancock's expert appraised the Debtor's property in conjunction with another farm only one final appraisal value was attributable to the Debtor's property. Both appraisers valued the improvements on the property. The appraisal figures are as follows:

| Land | Debtors' Expert | Hancock's Expert |
|---|---|---|
| Market Data Approach | $163,500.00 (includes improvements) | |
| Cost | | |
| Income/Earnings | 159,547.00 | |
| Improvements | 138,150.00 | $150,076.00 |
| | | 61,000.00 |

The Debtors' expert arrived at a final appraised value for the land and building of $163,500.00 relying on the Market Data Approach. Hancock's expert arrived at a final appraised value for the land and buildings of $211,076.00, but stated at trial that this amount would have to be decreased by three percent for the passage of time between the appraisal and trial. Therefore, his final value is $204,743.72 ($211,076.00—

$6,332.28). Neither appraiser properly valued the property using the income/earnings approach as set forth by this Court in *In re Cool,* 81 B.R. 614, 616–619, 5 Mont.B.R. 183, 187–193 (Bankr.Mont.1987). Accordingly, the Hancock expert's appraisal, which used only the income approach, is rejected under rationale set forth in *Cool,* supra. Therefore, from the evidence presented in this case, this Court adopts the value of the Debtors' property as set forth by the Debtors' expert using the Market Data Approach for a value of $163,-500.00. To this amount the value of the state lease must be added to arrive at the total value of the collateral. The Debtors' expert valued the state lease at $17,600.00 while Hancock's expert valued it at $11,-115.00. Again, however, Hancock's expert relied on a faulty Income Approach, so the Debtors' expert valuation of $17,600.00 is adopted by this Court. Accordingly, this Court finds the value of the Debtors' property, buildings and the state lease to be $181,100.00.

The Debtors submitted a farm equipment appraisal at a value of $77,497.50. No other appraisal of the farm equipment was submitted to the Court. Accordingly, this Court finds the value of the Debtors' farm equipment to be $77,497.50.

## OBJECTION OF SBA

■ The SBA objects to the Plan, based on its failure to provide unsecured creditors with as much as they would receive upon liquidation of the Debtors' assets. The Debtors filed an Amended Liquidation Analysis on July 9, 1987, showing no equity in their real property or farm equipment. However, the SBA points out that the Debtors did not include liquidation of their crops, foxes, automobiles or fox pens, all of which have equity.

Section 1225(a)(4), relating to confirmation of a Chapter 12 Plan, states:

"(a) Except as provided in subsection (b), the Court shall confirm a Plan if ...

(4) the value, as of the effective date of Plan, of property to be distributed

---

1. The Debtors filed a Supplemental Plan on August 20, 1987, containing information regarding a lease with the Debtors' brother, Milo Borg, which the Court disallowed and will not consider, as it is filed post-hearing.

under the Plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the Debtor were liquidated under Chapter 7 of this title on such date."

The SBA argues that § 1225(a)(4) requires that unsecured creditors receive at least as much under Chapter 12 as they would receive under a Chapter 7 liquidation. The Debtors, on the other hand, assert that the SBA's objection should be overruled because their Plan provides for payment of the Debtors' net disposable income pursuant to § 1225(b)(1)(B). Subsection 1225(b)(1)(B) states, in pertinent part:

"(b)(1) If the Trustee or the holder of an allowed unsecured claim objects to the confirmation of the Plan, then the Court may not approve the Plan, unless, as of the effective date of the Plan ...

(B) the Plan provides that all of the Debtor's projected disposable income to be received in the [period of the Plan] ... will be applied to make payments under the Plan."

The Debtors' position that § 1225(b)(1)(B) is an alternative to § 1225(a)(4) has previously been addressed by this Court in *In re Fauth*, 79 B.R. 490, 5 Mont.B.R. 126 (Bankr.Mont.1987). In *Fauth*, this Court, in dicta, reasoned that if § 1225(b)(1)(B) was satisfied, then § 1225(a)(4) should not necessarily come into play. However, recent study of the language, more recent case law, and legislative history of §§ 1225(a)(4) and 1225(b)(1)(B) now lead this Court to a different conclusion.

This Court stated in *In re Janssen Charolais Ranch, Inc.*, 73 B.R. 125, 126, 4 Mont. B.R. 290, 292 (Bankr.Mont.1987), that Chapter 12 interpretation may be made by using an analogy of Chapter 13 precedents. As the Court in *In re Willingham*, 83 B.R. 552, 553 (Bankr.S.D.Ill.1988), states:

"Section 1225(a), like Section 1325(a), contains six requirements that must be met before a Plan may be confirmed."

Sections 1225(a) and 1325(a) are almost identically written and have essentially the same provisions. The language of § 1225 leads the Court to find a distinction between the confirmation standards under Subsection (a) and those under Subsection (b).

"Unlike the confirmation standards of subsection (a), however, subsection (b) states a requirement that must be met only in the event of an objection by the Trustee or an unsecured creditor. *See Id*, Para. 1325.08[2], at 1325–45. From this distinction, it can be seen that the requirements of subsection (a) are separate from those of subsection (b) and that, rather than providing an alternative to compliance with subsection (a), subsection (b) sets forth an additional requirement for confirmation if objection is made under that subsection. *See In re Fries*, 68 B.R. 676 (Bankr.E.D.Pa.1986). The legislative history of Sec. 1325(b) likewise indicates that subsection (b) was intended as a separate test to be met in addition to, rather than instead of, the requirements of subsection (a). Subsection (b), contained in the Bankruptcy Amendments and Federal Judgeship Act of 1984, was added to resolve 'the ongoing dispute regarding whether there should be a minimum level of payments in Chapter 13, other than that set by the section 1325(a)(4) best interests of creditors test[.]' 5 *Collier on Bankruptcy*, Para. 1325.08[1], at 1325–42; *See Fries*, 68 B.R. at 682. While the 'good faith' standard of Sec. 1325(a)(3) had been interpreted by some Courts as requiring 'substantial' or 'meaningful' payments to unsecured creditors despite compliance with the minimum requirements of Sec. 1325(a)(4), the new amendment demonstrated that the 'good faith' standard of Sec. 1325(a)(3) did not set any minimum amount or percentage of payments that must be made to unsecured creditors. 5 *Collier on Bankruptcy*, Para. 1325.-08[1], at 1325–43. Rather, the 'ability to pay' test of Sec. 1325(b) set forth the definitive measure of required payments to unsecured creditors once the confirmation standards of Sec. 1325(a) had been met. *See id.* at 1325–44 to 45. The 'ability to pay' test of subsection (b) was thus intended as an additional protection for holders of unsecured claims (*See id.*

Para. 1325.05, at 1325–18 & n. 1) rather than as an alternative to the requirement of the 'best interests of creditors' test of subsection (a)(4)." *Willingham*, at 553–554.

Accordingly, the Debtors' Plan would not be confirmable if an objecting creditor will not receive under the Plan at least what it would be paid under a Chapter 7 liquidation.

In this case, the Debtors' liquidation analysis does not address any liquidation value for their crops, foxes, automobiles or fox pens. However, at trial and in their schedules, the Debtors did set the values of some of these assets. The Debtors set a value on the fox pens of $42,000.00, and set a value after exemptions and debt on their two automobiles of $3,050.00. The SBA claims that the Debtors' 1300 total foxes would have a liquidation value of $15,-560.00, after payment of the secured creditors, and that the crops on hand would also have some liquidation value. In the Amended Plan, the Debtors show carryovers of between $4,595.25 and $6,544.49 per year. Therefore, over the five year term of the Plan, unsecured creditors would receive $28,062.65. This amount is less than the unsecured creditors would receive under a Chapter 7 liquidation. Thus, the Plan cannot be confirmed as written since § 1225(a)(4) is not satisfied. However, the Debtors, in light of this Court's reversal of *Fauth*, should be afforded the opportunity to amend their Liquidation Analysis and Plan accordingly.

## OBJECTIONS OF NAVISTAR AND THE BANK

The objections of the Bank and Navistar are essentially identical and will be addressed together. Navistar and the Bank object to the term of repayment, the interest rate proposed and to the feasibility of the Plan.

■ The Debtors propose a repayment term of six (6) years for both secured creditors. Such a term has been found acceptable by this Court in several cases. *In re Foster*, 79 B.R. 906, 5 Mont.B.R. 108, 124 (Bankr.Mont.1987); *In re Martin*, 78 B.R. 598, 4 Mont.B.R. 513, 519–521 (Bankr.Mont.

1987). However, in this case, the Bank's expert witness testified that the equipment was depreciating at a rate of 10–15% per year. In their Plan, the Debtors will only pay off $1,000.00 in principal on the debt over the first 5 years. Accordingly, the principal reduction will not keep pace with the depreciation on the underlying security. Therefore, the Bank will not be retaining a lien on its security which is as valid as the lien on the date of confirmation. Section 1225(a)(5)(B)(i) requires the creditor to retain the lien. Therefore, the Plan is not confirmable and the Bank and Navistar's objections as to this point are sustained.

■ Navistar and the Bank next claim that the interest rate proposed is not the market rate of interest. Navistar is an oversecured creditor with collateral that is depreciating at a rate of 10–15% annually. The Bank is an undersecured creditor with collateral that is also depreciating at 10–15% annually. Accordingly, this Court finds that a risk factor of 2 percent above prime would be the appropriate interest rate. *See, Martin*, supra, at 519–521. *See, also, Patterson v. Federal Land Bank*, 86 B.R. 226 (9th Cir.BAP 1988), (discount rate should be set on case by case basis considering prime rate and nature and risk of security).

■ The Bank and Navistar further object to the feasibility of the Plan. In general, the two creditors question where the Debtors will come up with the money to pay the Plan's proposed balloon payments in year 6 of the Plan. At trial and in briefs, the Debtors have offered no evidence in support of obtaining the necessary money to make the balloon payments. The Debtors simply stated that they would refinance the property. However, the property is currently 100% financed and the Debtors offered no evidence that any equity would accrue in the property over the next 6 years. Therefore, the Bank and Navistar's objections to feasibility are sustained.

## OBJECTIONS OF THE FmHA

■ The FmHA objects to the Plan because it does not give the FmHA a secured

status in the Debtors' foxes, machinery or crops. The Debtors assert that the FmHA is unsecured due to improper UCC–1 financing statements and the fact that the foxes and their offspring have been "pelted out" and are no longer available. The security agreement, entered into evidence as "Government Exhibit A", grants the FmHA as collateral:

> "All ... fur bearing animals ... now owned or hereafter acquired by Debtors, together with all increases, replacements, substitutions and additions thereto, including but not limited to the following:
>
> \*       \*       \*       \*       \*       \*
>
> 50 fox (pairs)".

This Court in *In re Big Hook Land & Cattle Company*, 77 B.R. 793, 5 Mont. B.R. 268, 271–272 (Bankr.Mont.1987), outlined the obvious tension between § 552 and § 1225 of the Code, as to the offspring of animals which will be marketed to fund the Plan.

> "In *Matter of Wobig*, 73 B.R. 292, 294–295 (Bankr.Neb.1987), the Court discussed the proceeds derived from the sale of offspring of a livestock feeder pig operation and held:
>
>> 'There is obvious tension between the various sections of the Bankruptcy Code, including sections 552 and 1225. If the Court were to find that Debtor with a livestock operation subject to security intersts in livestock and the offspring of such livestock was unable to sell the livestock to fund an operating Chapter 12 Plan because of the terms of Section 1225(a)(5)(B)(i), no "family farmer" whose business was substantially a livestock operation would be able to obtain confirmation of a Chapter 12 Plan of reorganization.
>>
>> \*       \*       \*       \*       \*       \*
>>
>> The business of the Debtor is raising and selling feeder pigs. The Debtor owns certain sows which are subject to the security interest of the Bank. Debtor, through use of the labor and management skills and marketing skills, produces pigs that when fed to a certain size are sold. The proceeds of those sales are used in the ordinary course of business outside of bankruptcy to pay the operating expenses of the business and to make the payments to the Bank. Without the management services of the Debtor, there would be no offspring. If there were no offspring, the Bank, in a liquidation setting, would receive no more than the value of the sows as they exist at this time.'
>
> Likewise in this case, the proceeds from the after-acquired cattle through shares or calf crop are devoted to the payment of the ranch expenses and allowed creditors' claims. When the calf crop is marketed in the ordinary course of business, it is from these after-acquired livestock proceeds, developed from management work and skill that the farmer relies upon to fund the Plan. In short, the proceeds are not from pre-petition collateral of PCA, but are clearly from proceeds of after-acquired property. As a result, I conclude the allowed secured claim of PCA is fixed at $58,585.00, which includes livestock at the date of the petition, valued at $24,650.00. PCA's contentions to the contrary are rejected."

In this case, the Debtors fully intend to continue marketing the fox pelts to fund the Plan. Therefore, the FmHA is not entitled to a security interest in the after-acquired foxes as collateral for a secured claim amount. The Debtors also intend to use after-acquired crops to fund the Plan. For the same reasons cited above, the FmHA likewise cannot receive a secured claim status based on the value of the after-acquired crops.

The Debtors' machinery was appraised by their expert at $77,497.50. Of this amount, $58,015.00 is secured by other creditors. The FmHA is secured in the machinery for an amount of $19,482.50. Based on the foregoing, the FmHA's objection to being a totally unsecured creditor is sustained, and FmHA is determined to be a secured creditor in the sum of $19,482.50.

## OBJECTION OF RICHLAND FCU

The RFCU objects to the Plan's feasibility with regard to the payment of the balloon in the sixth year. As stated above,

this is a meritorious objection and is sustained.

OBJECTIONS OF HANCOCK

Hancock objects to the Plan based on the Debtors' eligibility for Chapter 12, the Debtors' lack of good faith, the Debtors' valuations and the Plan's feasibility. This Court has already ruled that the Debtors are eligible for Chapter 12 and that the Plan will not be dismissed on a lack of good faith basis. So those objections are again overruled.

As stated above, this Court finds that valuation of the Debtors' property to be $181,100.00. Therefore, Hancock's objection based on valuation is sustained and the Debtors will have to amend their Plan to reflect this amount.

Hancock also objects to the Plan's feasibility. Due to rulings in this Order which require amendments to the Plan, feasibility will be addressed after a hearing on the Debtors' Final Amended Plan.

IT IS ORDERED that the Debtors' Amended Plan is denied confirmation and that the Debtors shall have ten (10) days to file any amendments which are in accordance with this Order, or this case will be dismissed.